**COURTAULDS (ALABAMA) INC., LeMoyne, Alabama, Plaintiff,**

v.

**Earl W. KINTNER, individually and as Chairman of Federal Trade Commission, and Robert T. Secrest, Sigurd Anderson, William C. Kern and Edward T. Tait, individually and as Commissioners of Federal Trade Commission, and Federal Trade Commission, Washington 25, D. C., Defendants.**

**Civ. A. No. 219–60.**

United States District Court
District of Columbia,
Civil Division.

March 4, 1960.

---

Wilmer & Broun, Hugh R. H. Smith, Washington, D. C., for plaintiff.

Oliver Gasch, U. S. Atty., John F. Doyle, Asst. U. S. Atty., Washington, D. C., for defendants.

YOUNGDAHL, District Judge.

Plaintiff, a textile manufacturer, has moved the Court to enjoin the Federal Trade Commission, its Chairman and Commissioners, pending the outcome of this lawsuit, from enforcing the Commission's newly promulgated Rules and Regulations under the Textile Fiber Products Identification Act,[1] insofar as those Rules and Regulations require the plaintiff to identify its cross-linked cellulosic fibers as rayon.

The Textile Act, enacted on September 2, 1958, was designed "to protect producers and consumers against misbranding and false advertising of the fiber content of textile fiber products"; it is said to be "in the tradition of the Wool Labeling Act of 1939, and the Fur Products Labeling Act of 1951".[2] Section 7(c) of the Textile Act, 15 U.S.C.A. § 70e(c), provides:

> "The Commission is authorized and directed to make such rules and regulations, including the establishment of generic names of manufactured fibers, under and in pursuance of the terms of sections 70–70k of this title as may be necessary

---

1. 72 Stat. 1717–1724; 15 U.S.C.A. §§ 70–70k (hereinafter referred to as the Textile Act).

   The Rules and Regulations may be found in 24 Fed.Reg. 4480–4487 (June 2, 1959).

2. S.Rep. No. 1658, 85th Cong., 2d Sess. (1958); 3 U.S.Code Cong. and Admin. News 5165.

and proper for administration and enforcement."

On February 10, 1959, the Commission published, in the Federal Register, a notice of hearing and its proposed rules under the Textile Act.[3] In March, 1959, public hearings were held and on June 2, 1959, the Commission promulgated its Rules and Regulations.

Sixteen categories for manufactured (as opposed to natural) fibers were established; one of these sixteen is "rayon" and its definition is given by the rule as:

"A manufactured fiber composed of regenerated cellulose, as well as manufactured fibers composed of regenerated cellulose in which substituents have replaced not more than 15 percent of the hydrogens of the hydroxyl groups." Sec. 303.7 (d); 24 Fed.Reg. 4482 (June 2, 1959).

For the past several years plaintiff has been in the business of manufacturing and selling fibers composed of regenerated cellulose and since July, 1958, the plaintiff has been selling cross-linked cellulosic fibers with the trade names of "Corval" and "Topel" and which are manufactured by a recently patented process. There is no question but that "fibers composed of regenerated cellulose" fall within the definition of rayon in Sec. 303.7(d)—they do so expressly.

There is a question (a) whether "cross-linked cellulosic fibers" fall within the new definition, and (b) if they do, whether they should—i. e., is a definition of "rayon" which embraces plaintiff's cross-linked cellulosic fibers so unreasonable as to be invalid.

In paragraph 20(c) of the complaint, the plaintiff states it demonstrated at the public hearings that "the broadened definition of the generic name rayon in Proposed Rule 7(h) did not as a matter of chemistry cover cross-linked cellulosic fibers". Plaintiff has submitted an affidavit of a chemist, John Wharton. But this affidavit, and that of a Paul B. Stam, do not state that plaintiff's fiber does not fall within the definition in Sec. 303.7(d). They state only that plaintiff's fiber is "different from regenerated cellulose", "significantly [chemically] different from rayon (regenerated cellulose)."

On the other hand, the Court has before it the affidavit of Thomas J. Anderson, an attorney with the Federal Trade Commission, who states that after conferences and hearings were held on the question of whether cross-linked cellulosic fibers fell within the proposed rayon category,[4] the Commission issued its Rules and Regulations, including subparagraph (d) of Rule 7 defining the term "rayon" "in a manner" which "unquestionably included plaintiff's cross-linked cellulosic fiber".[5]

---

3. 24 Fed.Reg. 980–986 (February 10, 1959).

4. When the proposed rules were published in the Federal Register on February 10, 1959, the statement was expressly made that "(o)ther matters for consideration are whether or not rules should be promulgated by the Commission. * * * "(4) Establishing generic names and definition for cross-linked cellulosic fibers." 24 Fed.Reg. 980 (February 10, 1959).

5. Affidavit of Thomas J. Anderson, p. 4. And see F.T.C. release of June 1, 1959: "Where feasible, chemical symbols have been included in the definitions of man-

made fibers for which generic names have been set out. The purpose of these symbols is to preclude question as to what particular chemical unit is being identified in a definition. Also, the same rule defines the generic name 'rayon' as 'a manufactured fiber composed of regenerated cellulose, as well as manufactured fibers composed of regenerated cellulose in which substituents have replaced not more than 15 per cent of the hydrogens of the hydroxyl groups.' Man-made cross-linked cellulose fibers concerning which there was a request for a new generic name would fall within the 'rayon' definition." 2 CCH Trade Reg.Rep. paragraph 6753.

█ The Court concludes that plaintiff probably will not succeed in showing its fiber is not within Sec. 303.7(d), and thus will examine the second question: is Sec. 303.7(d) unreasonable by virtue of its embracing plaintiff's fiber?

The Court starts with the admonition of Mr. Justice Brandeis:

"[W]here the regulation is within the scope of authority legally delegated, the presumption of the existence of facts justifying its specific exercise attaches alike to statutes, to municipal ordinances, and to orders of administrative bodies." Pacific States Box & Basket Co. v. White, 1935, 296 U.S. 176, 186, 56 S.Ct. 159, 163, 80 L.Ed. 138.

And see Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, 1958, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925.

While it appears that plaintiff's fiber has capabilities which distinguish it from those of "ordinary rayon" (regenerated cellulose), it is not clear from the legislative history of the Textile Act that performance characteristics—e. g., strength, durability, washability—were intended by Congress to be considered by the Federal Trade Commission in its "establishment of generic names of manufactured fibers".[6] Before it was enacted, the legislation was described as "a disclosure bill, for the protection of the consumer".[7] While it seems apparent that the most effective method of "disclosure" would be in terms of performance characteristics—bearing in mind that we are concerned primarily with "the protection of the consumer"—evidently this ideal method was not feasible.[8]

Since categories based upon performance characteristics were not possible,

6. Sec. 7(c) of the Textile Act, 15 U.S.C.A. § 70e(c).

7. Supra, footnote 2.

8. In Hearings Before a Subcommittee of the House Interstate and Foreign Commerce Committee on H.R. 469, 85 Cong. 1st Sess. (1957), the author of the Bill, Congressman Frank E. Smith, stated:
"It has been argued, for example, that content labeling will not convey really worthwhile information to the consumer, and that so-called performance labeling is the most desirable solution. I am sure every homemaker in America would be grateful for performance labeling that would tell her exactly how the textile she buys would react to water or an iron at 100 degrees, or 200 degrees, or 500 degrees, and how long it could be expected to last if properly handled, and whether the color would survive soap, or detergent, or sun, or the years. Unfortunately, the industry itself concedes that there is no agreement on a standard of performance characteristic or the method of measuring those characteristics, or any method, for that matter, of publishing them, if you had any standard to give. *Any generally acceptable standard for performance labeling is therefore a dream of the distant future.*
"Lacking performance data, fiber content labeling will give the consumer specific information on what she is buying,

and this, when related to the wealth of published information on the characteristics of the various fibers, will afford her tremendous protection that she does not now have." (p. 24.) (Emphasis added.)
The attitude of a manufacturer's representative can be seen in the following colloquy between Congressman Peter F. Mack, Jr., Chairman of the Subcommittee holding hearings on the proposed Textile Act, and Richard W. Trapnell, an officer of E. I. Du Pont de Nemours & Co.:
"Mr. Mack. Do you see any possibility, or is there any probability that at some future date we will be able to develop performance standards so that they could be included in labels, labeling, and so forth?
"Mr. Trapnell. We think it is a long time off. The tests we have today to determine the suitability, wear life, whatever you want to call it, of a fabric for a garment or furniture or carpet, are not sharp enough tools for us, really.
"Also, you can have a fabric which is perfect in every respect, and have it when put in garment form give the consumer a very bad buy.
"A fabric which does everything the consumer would expect of it, if it is improperly sewn together, linings, inner linings, and so forth, are used; performance

chemical construction was the criterion chosen. This Court is not prepared to say such a criterion is an unreasonable one. Nor can it say, on the record before it, that the single category of rayon, as defined, is an unreasonable one. To the plaintiff's contention that the public will be deceived—rather than informed—by being told that "Corval" is "Corval rayon" must be weighed the proposition that categories, after all, had to be established. Too many categories could be just as deceptive as too few or none at all.[9] Congress realized this[10] and left to the experts in the Federal Trade Commission the resolution of the problem.[11]

It is the Court's opinion, therefore, that the plaintiff has not shown that it will probably be able to prove the class an unreasonable one.

Furthermore, it does not appear that the plaintiff will suffer irreparable injury because it has to comply with the Commission's rules. There is no requirement that plaintiff cease calling its fiber by its trade name or that plaintiff cease advertising the performance capabilities of its fibers; the requirement is that the word "rayon" be appended to whatever other words are used to describe the fiber. Plaintiff contends that qualifying adjectives are inadequate to dispel the unfavorable connotation created by "rayon"; further, that once the public is told that "Corval" is "Corval rayon", plaintiff, in the future, will continue to suffer the public's prejudice against rayon even though plaintiff ultimately succeeds in this suit and thereafter deletes "rayon" from its description.

standards with regard to the fabric have no bearing on consumer satisfaction.

"Mr. Mack. I suppose it would be a very difficult thing, too, because you would almost need a separate performance standard for each industry.

"Mr. Trapnell. For each industry, and for each fiber blend, perhaps, within the industry.

"Mr. Mack. It would make it very difficult, if not impossible.

"Mr. Trapnell. It would be very difficult to arrive at, and extremely difficult to administer, I am sure.

"Mr. Mack. That is my point, and I think it would be." (pp. 166–167.)
The Senate report had this to say:

"Since this bill is designed to protect the consuming public, your committee believes these requirements are essential. To the argument that a performance label rather than a content label would better protect the public, your committee must answer that of the two, it believes this bill to be the best. The consumer, we believe, will quickly learn the blends that suit his needs. This knowledge, together with the reputation of the people involved in the processing and makeup of the finished article, will in the end be the protection the user seeks." Supra footnote 2 at p. 5167.

9. In the Man-Made Textile Encyclopedia (1959), at pp. 874–877, there are over two hundred listings of trade names under "Rayon". Two of the listings are for plaintiff's Corval and Topel.

10. "Mr. Smith. The problem is that there are a large number of names that have originated, just brand names or trade names that have come to mean the same as a generic term.

"Mr. Alger. Speaking of rayon or dacron or nylon?

"Mr. Smith. That's right. They originally first started as trade names, and more and more of these trade names will probably develop as newer types of fabrics are found by the chemists, and as they work them out. There should be in the labeling some provision to insure that established generic names are used for fibers that are of the same chemical construction. There should be a provision to insure that these endless trade names can be recognized for what they are— the same products." Supra footnote 8, Hearings at p. 35.
Congressman Smith also stated:

"It is my belief and I am sure it is the Congressional intent that *generic names should be determined on the basis of the broad, chemical composition of the fiber.* Questions of processing, or finishing, or minor modifications in composition, should not enter in that determination." (Emphasis added.) (Transcript of Hearings, March 10, 1959, Federal Trade Commission File No. 206–1, p. 15).

11. It should be pointed out that the Commission's Rules and Regulations do provide a procedure for establishing new categories. Sec. 303.8 (24 Fed.Reg. at 4482).

Plaintiff's contention relies upon three premises: first, the public has a bias against rayon; second, plaintiff's advertising budget will remain constant; third, the advertising men will not be talented enough to re-educate the public.

The record is meager with regard to the first premise; the second lies within the control of the plaintiff; the third is dubious. The men of Madison Avenue have been able to implant in the mind of the public countless slogans —sensible and otherwise. They have sold shirts by depicting a man with an eye-patch; they have sold soap by advertising it to be "99 and 44/100'ths per cent pure" without bothering to add the noun; they have sold brassieres by displaying a sleepwalker. Can it reasonably be said that they are now unable to distinguish one fiber from another, particularly when the two fibers possess "materially different physical and textile characteristics"?[12] This remote future inability does not rise to a showing of irreparable injury sufficient to enjoin an agency of the Government, acting in the public interest.

Plaintiff has also contended that procedural irregularities occurred in the promulgation of the Commission's rules. Specifically, it asserts that non-public information was utilized by the Commission and that the rules do not contain "a concise general statement of their basis and purpose".[13] The Court has carefully examined the record and concludes that these contentions are without merit. Van Curler Broadcasting Corp. v. United States, 1956, 98 U.S.App.D.C. 432, 236 F.2d 727, cf. Sangamon Valley Television Corp. v. United States, 1959, 106 U.S.App.D.C. 30, 269 F.2d 221.

Counsel for the defendant is requested to submit findings of fact, conclusions of law and an order in conformity with this opinion.

The motion for a preliminary injunction is denied.

12. Plaintiff's complaint, paragraph 7.

13. Sec. 4(b), Administrative Procedure Act, 60 Stat. 238 (1946), 5 U.S.C.A. § 1003(b).