**COURTAULDS (ALABAMA) INC.,**
Appellant,

v.

Paul R. DIXON, individually and as Chairman of the Federal Trade Commission, et al., Appellees.

No. 16054.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 8, 1961.

Decided April 27, 1961.

Mr. John R. Hupper, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Hugh R. H. Smith, Washington, D. C., and Albert R. Connelly and Walter H. Weiner, New York City, were on the brief for appellant.

Mr. Frank Q. Nebeker, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Carl W. Belcher, Asst. U. S. Atty., PGad B. Morehouse, Acting Gen. Counsel, F. T. C., Alan B. Hobbes, Asst. Gen. Counsel, F. T. C., and Francis C. Mayer, Atty., F. T. C., were on the brief, for appellees.

Before Mr. Justice BURTON, retired,* and DANAHER and BASTIAN, Circuit Judges.

DANAHER, Circuit Judge.

Appellant challenged certain rules and regulations promulgated by the Federal Trade Commission under the Textile Fiber Products Identification Act.[1] No appeal was taken from the denial [2] of appellant's motion for a temporary injunction.

Thereafter the Commission moved for summary judgment, itemizing its rule-making steps and concluding that its Rule 7(d) [3] applies to appellant's fiber. Appellant's cross-motion, alleging that "there exists no genuine issue as to any

material fact," rested upon the pleadings, various affidavits and a stipulation [4] (with exhibits), entered into for the purpose of disposition of the respective motions. On the record so constituted, and after argument, the District Judge refused to find that the Commission's acts were arbitrary or capricious or that the definition of rayon, under attack, was without justification. Judgment was entered for the appellees, the Commission and its members, hence this appeal.

Basically appellant has asked the courts to declare unlawful and to annul the Commission's Rules [5] promulgated under the Act, "and particularly Rule 7(d),[6] insofar as they require appellant's new cross-linked cellulosic fiber to be designated as rayon fiber." Additionally, appellant attacks "the Commission's refusal to establish a separate and distinct generic name and definition for cross-linked cellulosic fibers."

I.

█ We recently reviewed and sustained the exercise of the Commission's rule-making authority with respect to fiber identification, particularly Rule 7(d) thereof.[7] But it may be helpful briefly to recapitulate certain pertinent provisions of the Act, the purpose of which is "To protect producers and consumers against misbranding and false

* Sitting by designation pursuant to 28 U.S.C. § 294(a).

1. 72 Stat. 1717, 15 U.S.C.A. §§ 70–70k.

2. Courtaulds (Alabama) Inc. v. Kintner, D.C.D.C.1960, 182 F.Supp. 207.

3. 16 C.F.R. § 303.7.

4. Appended pursuant to District Court's Rule 9 was appellant's statement of material fact as to which there is no dispute, supplementing the stipulated statements of agreed fact.

5. 16 C.F.R. §§ 303.1–303.45 (1960).

6. Rule 7(d) in pertinent part reads:
"Generic Names and Definitions for Manufactured Fibers.
"Pursuant to the provisions of section 7(c) of the Act, the following generic names for manufactured fibers, together

with their respective definitions, are hereby established:

\* \* \* \* \*

"(d) *Rayon.* A manufactured fiber composed of regenerated cellulose, as well as manufactured fibers composed of regenerated cellulose in which substituents have replaced not more than 15 per cent of the hydrogens of the hydroxyl groups."

7. Bigelow-Sanford Carpet Co., Inc. v. Federal Trade Commission, 110 U.S.App. D.C. ——, 294 F.2d 718. There neither the appellant nor its predecessors in the manufacture of the particular fiber had participated in the rule-making proceedings. The Commission's later refusal to grant a Rule 8 application for the establishment of a new generic name for appellant's fiber "polynosic" was not shown to have been unlawful.

advertising *of the fiber content of textile fiber* products, and for other purposes." (Emphasis added.) Section 2(b) defines "fiber" or "textile fiber" to be "a unit of matter which is capable of being spun into a yarn or made into a fabric by bonding or by interlacing in a variety of methods * * * and which is the basic structural element of textile products." Section 2(d) defines "manufactured fiber" to mean "any fiber derived by a process of manufacture from any substance which, at any point in the manufacturing process, is not a fiber." Section 7(c) of the Act authorizes and directs the Commission "to make such rules and regulations, including the *establishment of generic names of manufactured fibers*, under and in pursuance of the terms of this Act as may be necessary and proper for administration and enforcement." (Emphasis added.)

▮ Appellant on brief tells us:

"The first and still by far the most common type of fiber manufactured from cellulose is rayon. In the rayon manufacturing process, naturally occurring, non-spinnable cellulose, usually in the form of wood pulp, is combined with other substances and dissolved, without destruction of the polymer, and then precipitated from solution in a spinnable fibrous form suitable for textile use. Since rayon is created by the above-described process of 'regenerating' cellulose, it has long been described in the textile industry as a manufactured fiber composed of regenerated cellulose. Indeed, the Commission's Trade Practice Rules for the Rayon and Acetate Textile Industry, promulgated in 1951,[8] specifically defined rayon as 'composed of regenerated cellulose.'"

▮ It may readily be deduced that "rayon" as defined and as described by appellant is squarely comprehended within the statutory definition of section 2(b) and 2(d) of the Act, supra.

At least since 1952 appellant had been engaged in the business of manufacturing and selling rayon fiber under various trade-marks to producers of textile products. By 1958, after research and experimentation, appellant claimed it had commercially introduced a new kind of fiber embodying its invention of a process for the manufacture of cross-linked cellulosic fibers. Appellant asserted that its new product so far differed both chemically and physically from rayon as previously known, as to entitle appellant to a new generic name. Whereas rayon can be said to be a fiber composed solely of regenerated cellulose, appellant's cross-linked cellulosic fibers, on the other hand, are fibers which are cross-linked in the manufacturing process by the chemical reaction of cellulose and other chemical compounds involving the substitution for units of cellulose, the product of such reaction. Otherwise stated, appellant asserts that prior to the complete formation of the cross-linked fibers in the manufacturing process, cellulose and other compounds react chemically to produce a compound different from rayon fiber; the resulting cross-linked fibers are three-dimensional in their chemical structure rather than the linear chain form of rayon fiber; the cross-linked fibers have properties materially different from those exhibited by ordinary rayon fiber in that they possess higher elastic recovery, yield a fabric more dimensionally stable, and otherwise possess characteristics lacking in rayon as such. The end-product fabric containing appellant's cross-linked cellulosic fibers possesses, it is argued, highly desirable

8. The 1951 Rules superseded Trade Practice Rules for the rayon industry which had been promulgated by the Commission on October 26, 1937, which in turn related back to the Commission's 1925 acceptance of the industry's definition of "rayon." The 1951 Rules, directed to the elimination and prevention of unfair or deceptive practices, were seen by the Commission as necessary because of "the failure to properly identify and disclose *the fiber content* of industry products." (Emphasis added.) The Commission's long experience in related fields is a matter of common knowledge.

properties which, indeed, may well be true.

It is asserted thus that the definition of rayon in the 1951 Trade Practice Rules did not cover appellant's 1958 product nor did the definition first proposed when the Commission's notice of hearing was published on February 10, 1959 with respect to the rule-making proceeding, presently attacked.

Appellant's representations to the Commission exhibited some arguable basis for differentiation of its compound fiber from that previously identified as rayon. Yet the Commission, out of the background of its own long acquaintance with the problem and the testimony given at hearings before the Congress, had been commanded to establish generic names of manufactured fibers. Accordingly, it concluded that the challenged definition is appropriate.

In turn, the District Court had before it not only the stipulation of the parties and the affidavits of the experts, but the several exhibits upon which appellant relied. In testing the reasonableness of the Commission's Rule 7(d) definition the full scope of appellant's claims could be seen. "[R]egardless of which two fibers are chosen from among the 16 for which the Commission has proposed separate generic names, it would be practically impossible not to have at least some properties of each of those fibers which are similar or identical. It is submitted that similarity or identity with respect to a few properties does not mean that lincron [appellant's proposed generic name] and rayon should not be separately identified in light of the many properties and end uses of the two fibers which are substantially different whether or not rayon is cross-linked in the piece." [9]

Appellant's expert in his affidavit in support of plaintiff's cross motion stated:

"The definition of rayon contained in Final Rule 7(d) which the Commission caused to be published in the Federal Register on June 2, 1959 under the authority of said Section 7(c) covers plaintiff's cross-linked cellulosic fibers and indeed includes:

"(i) fibers which might contain, according to my calculations, from 100% to as little as 1% by weight of long-chain molecules of regenerated cellulose, the remainder of such fibers being composed of different chemical compounds resulting from the reaction of regenerated cellulose with other substances;

"(ii) fibers in which from 100% to less than 50% of the celloboise units, which are the fundamental repeating units in long-chain molecules of regenerated cellulose, remain chemically unreacted with other substances; and

"(iii) all known types of cross-linked cellulosic textile fibers."

Even as appellant's affiant argued against inclusion of reference to the hydroxyl groups and insisted that the molecules in appellant's cross-linked cellulosic fibers had reacted chemically to form a different compound, he was bound to concede that the definition does cover the appellant's cross-linked cellulosic fibers.[10] We are constrained to the conclusion that the choice was one for the Commission to make.

9. Appellant's Exhibit 48.

10. Appellant's proposed definition of "Lincron," it may have seemed to the Commission, was one which described only the product of its proponent. Appellant asked that in a separate generic category its fiber be defined as:

"A manufactured fiber in which the fiber-forming substance consists of at least 50% by weight of a three-dimensional polymer of polyanhydroglucose units chemically combined through methylene ether derivatives and/or formal groups, in which the linkage obtained by such chemical combination is sufficient to render the fiber insoluble in normal cellulose solvents and to give a cross-sectional area swelling in water below 50%."

Appellant alleged that its petition had been joined in and supported by manufacturers of approximately 85% of all rayon produced in the United States.

## II.

Appellant insists that section 4(b) of the Administrative Procedure Act [11] has not been followed in that the Commission has failed to incorporate in the rules "a concise general statement of their basis and purpose." We think appellant fails to take into account the specific provisions of the Act itself where the purpose could scarcely be more definitely stated and the basis of fiber identification had been selected by Congress. The legislation itself had spoken precisely. It did so after extensive House hearings on April 4, 5, 11, 12 and 29 in 1957, where important segments of the interested industries had appeared, pro and con. Conferences and conventions of industry spokesmen had explored and discussed the impact of various proposals. Senate hearings were held February 24, 25, 26 and 27, 1958 at which were represented scores of trade associations and thousands of dealers, users and manufacturers of fabrics and textiles. Our close reading of all the testimony discloses consistent and informed opposition to the pending bill, the Executive Director of the Textile Fabrics Association making the point that "The only beneficiaries of this bill will be those producers who are endeavoring to promote new fibers to the public." [12]

Much argument was advanced that performance characteristics should predicate standards. Yet other witnesses insisted that blends of fibers determined performance, and only by fiber identification could the purposes of the bill be achieved.

Congress made its choice, a policy determination beyond our scope to question.

"Testimony at the hearings held by your committee stressed that it was now possible to make almost any fabric of a particular fiber look and fell like a fabric from another fiber. Consequently, it is possible to take a synthetic fiber, such as rayon, and make it look like cotton. Moreover, it is possible to sell this fabric as cotton since a label designating fiber content and the percentages therein is not now required. Within the past few years, new developments in fiber blending, chemical finishing of fabrics and weaving techniques have been perfected. Consequently, whereas it used to be possible for the consumer to feel a fabric and state its fiber content, now even experts are confused. The consumer, therefore, is unaware of the actual quality of the product.

"The consumer is jeopardized by the fact that the purchase of a fabric carries with it certain assumptions with regard to launderability, durability, warmth, strength, and other well-known or advertised characteristics. Yet, if the fabric is not of the fiber assumed, the consumer's requirements may not be satisfied. Proper identification of fibers would give the consumer the basic identity of the fabric and would increase his confidence in the marketing of textiles.

\*　\*　\*　\*　\*　\*

"\*　\*　\* [Y]our committee has confidence in the Federal Trade Commission and its ability to implement this legislation by rules and regulations." [13]

As the Congress knew, and as the parties stipulated, since 1925 the Commission had recognized "rayon" as meaning and as referable to certain artificial products, "the basis and chief ingredient of which is cellulose." Amended from time to time, the definition depended for its guiding standard on the broad, chemical basis of the fibers, not their physical properties, and by this standard appellant's "cross-linked rayon was identified as rayon since the fiber-forming substance is still regenerated cellulose." The Commission's conclusion cannot be

---

11. 5 U.S.C.A. § 1003(b).

12. Cf. note 10 supra.

13. S.Rep. No. 1658, 85th Cong., 2d Sess. 2, 4 (1958).

said, as a matter of law, to be unreasonable or arbitrary.

We find that the Act itself, as well as the rules, stated the purpose of the latter, to prevent misrepresentation of fiber products and the basis was fiber identification; in Rule 7(d) specifically, rayon is a generic name for a fiber the basis of which is regenerated cellulose with or without varying amounts of non-fiber forming materials. We are satisfied that the rules are not vulnerable for their alleged failure to state concisely their purpose and their basis, and on the contrary, that read as a whole, they fairly reflect both.

### III.

Appellant next would have us declare "null and void" the Commission's rule making and its refusal to grant a new generic name to appellant's fiber on the ground that the Commission had received "ex parte" material.[14] We find no evidence whatever that the Commission improperly "considered" any such data. For all that appears, it may have considered representations from many sources and then *rejected* whatever was deemed inapropos. It is certainly so— and the parties stipulated—that neither final Rule 7(d) nor any other rule established a separate generic name and definition for the "cross-linked cellulosic fibers" of *any* producer.

So far as the manufactured fiber industry was involved it might appear that every interest of any consequence was represented at the Congressional hearings over a long period. After the Act was approved, September 2, 1958, its effective date was postponed to March 3, 1960, with the Commission meanwhile proceeding informally, but after notice and as Congress directed to establish generic names for manufactured fibers.

Interested parties, including appellant, were invited to present suggestions. Appellant did so. Over a period of many months, conferences were conducted by Commission staff members with "interested and informed parties, in certain of which [appellant] participated."

In November, 1958, appellant sought a rule applicable to its fiber which would create the generic name "lincron." [15]

Appellant's proposal, in turn, was canvassed with the appellant, Government spokesmen and others, and was the subject of correspondence addressed to the Commission by appellant itself, as well as others.

The Commission's formal notice of hearing with respect to the projected rules included a proposed definition of rayon. In the course of the hearings oral and written comments were submitted by appellant and others, and the record remained open until March 27, 1959, for the submission of yet further written statements, including those offered by the appellant.

■■ We fail to find any basis for appellant's suggestion that somehow its "competitors" had unlawfully so influenced the formulation of the Commission's generic category defining rayon as to taint the whole proceeding and Rule 7(d) in particular.[16] We find no evi-

14. The "Stipulation of Fact" submitted to the District Court included the following:

"19. Prior to the issuance of the final rules, material and information was sought and received by the Commission and its staff *ex parte* from other governmental and private sources, including representatives of plaintiff and producers of other fibers and including producers of other fibers competitive with the fibers manufactured by plaintiff.

"20. Such *ex parte* communications related in part specifically to the definition of rayon and to plaintiff's application for a separate and distinct generic name for what it describes as cross-linked cellulosic fibers. The Commission in issuing the final rules considered the public record, its own files and such *ex parte* communications."

15. Supra note 10.

16. Appellant relies upon Sangamon Valley Television Corp. v. United States, 1959, 106 U.S.App.D.C. 30, 269 F.2d 221. That opinion is completely distinguish-

dence that the Commission improperly did anything in secret or gave to any interested party advantages not shared by all.[17] Rather, the Commission refused to adopt appellant's proposed definition of its own product as comprising a generic category, manufactured beginning in mid-1958 under its trademarks "Corval" and "Topel." [18] Even appellant's patent states that the invention "relates to a process for improving the properties of regenerated cellulose fibrous material and in particular to a process for introducing heat hardenable resinous materials into regenerated cellulose fiber."

### IV.

Appellant has made no showing of illegality in the Commission's execution of its duty to establish the generic category defining rayon. In sum, we are satisfied that the Commission has not acted arbitrarily or capriciously in the respects complained of. Nor are we persuaded that there has been a denial of administrative due process; on the contrary, we think appellant's contentions were fairly explored and in the light of the Congressional command, the Commission's action was reasonable. It follows that the judgment of the District Court must be

Affirmed.

able on its facts and in principle. The instant case in no way involves a license to be available to only one competing applicant nor is there a suggestion here of what "competitors" are advantaged by the Commission's adoption of the broad generic category "rayon." Moreover, the instant proceeding clearly was one of rule making, both in form and in substance, and hence was not subject to all the restrictions applicable to a quasi-judicial hearing. And see Van Curler Broadcasting Corp. v. United States, 98 U.S.App.D.C. 432, 435, 236 F.2d 727, 730, certiorari denied 1956, 352 U.S. 935, 77 S.Ct. 226, 1 L.Ed.2d 163.

17. The parties in their stipulation before the District Court agreed:
"During the period from March 13, 1959, to June 2, 1959, representatives

of plaintiff offered to aid the Commission's staff in revising the proposed rules and preparing the final rules with respect to the definition of rayon and with respect to plaintiff's application in light of the statements made during the public proceedings. Members of the Commission's staff conferred with regard to the above but declined to disclose to plaintiff (or any other affected party) the contents of the final rules then under consideration."

18. The Commission's news release announcing the adoption of the generic classifications states, as our record shows: "There are now over 700 tradenames for manufactured fibers, all of which may be classified within one or more of the 16 generic groups which have been defined by the Commission."