564 F.2d 458
 183 U.S.App.D.C. 437, 2 Media L. Rep. 2120
 ACTION FOR CHILDREN'S TELEVISION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Broadcasting Companies, Inc., CBS, Inc., Intervenors.
 No. 74-2006.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 14, 1976.
Decided July 1, 1977.
Rehearing Denied Aug. 24, 1977.
 
 Earle K. Moore, New York City, and Henry Geller, with whom Rachel Wolkin and Ellen Shaw Agress, New York City, was on the brief, for petitioner.
 C. Grey Pash, Jr., Counsel F.C.C., with whom Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C. and Carl D. Lawson, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Joseph A. Marino, Associate Gen. Counsel, F.C.C., Washington, D.C., at the time the record was filed also entered an appearance for respondent Federal Communications Commission.
 J. Roger Wollenberg and Timothy B. Dyk, Washington, D.C., entered appearances for intervenor, CBS, Inc.
 Carl R. Ramey, Washington, D.C., entered an appearance for intervenor, American Broadcasting Companies, Inc.
 Before TAMM, MacKINNON and WILKEY, Circuit Judges.
 Opinion for the court filed by TAMM, Circuit Judge.
 TAMM, Circuit Judge:
 
 
 1
 This appeal comes to us upon a petition for review of a decision by the Federal Communications Commission (Commission or FCC) not to adopt certain rules proposed by a public-interest organization to improve children's television. We affirm the Commission because we find that it substantially complied with the applicable procedures, provided a reasoned analysis for its action, did not depart from established policies, and did not otherwise abuse its discretion.[1]
 
 I. BACKGROUND
 A. The Rulemaking Proceedings
 
 2
 In February, 1970, Action for Children's Television (ACT), a Massachusetts non-profit corporation, submitted several proposals to the Commission to improve children's television fare, principally by eliminating all sponsorship and commercial content from such programming and by requiring all licensees to provide a minimum amount of age-specific programming for children. Specifically, ACT urged the adoption of the following rules:
 
 
 3
 (a) There shall be no sponsorship and no commercials on children's programs;(b) No performer shall be permitted to use or mention products, services or stores by brand names during children's programs, nor shall such names be included in any way during children's programs;
 
 
 4
 (c) Each station shall provide daily programming for children and in no case shall this be less than 14 hours a week, as a part of its public service requirement. Provision shall be made for programming in each of the age groups specified below, and during the time periods specified:
 
 
 5
 (i) Pre-school; 7 am-6 pm daily
 
 
 6
 ages 2-5 7 am-6 pm weekends
 
 
 7
 (ii) primary; 4 pm-8 pm daily
 
 
 8
 ages 6-9 8 am-8 pm weekends
 
 
 9
 (iii) elementary; 5 pm-9 pm daily
 
 
 10
 ages 10-12 9 am-9 pm weekends
 
 
 11
 Petitioner's Brief at 9; Government's Brief at 3.
 
 
 12
 The Commission accepted ACT's submission as a petition for rulemaking[2] and invited public comments on the proposals. Public Notice (Mimeo No. 44628) of Feb. 12, 1970; J.A. 85-86. The response was considerable. Not surprisingly, the general public expressed strong support,[3] at least for the essential objectives sought by ACT's petition, while the broadcast and advertising industries were mostly opposed.[4] Petitioner's Brief at 9; Government's Brief at 4; J.A. 117. In January, 1971, almost a year after ACT first submitted its proposals, the Commission issued a formal Notice of Inquiry and Notice of Proposed Rulemaking, Docket No. 19142, 28 F.C.C.2d 368 (1971); J.A. 116-21, pursuant to section 403 of the Communications Act of 1934, as amended (the Act), 47 U.S.C. § 403 (1970). While noting that important and perhaps substantial objections had been raised to adoption of any of the ACT proposals, the Commission observed that television programming and advertising practices for children raised "high public interest considerations", warranting further, more detailed study.[5] 28 F.C.C.2d at 370-71; J.A. 118. Thus, in this second request for comments the Commission sought to obtain from all licensees and networks both general information concerning children's programming and advertising, and a representative sample of specific data from a composite week during 1969-1970. Public comments were once again invited on the ACT proposals and on a variety of related issues.[6] Id. at 370-72; J.A. 118-20. The Commission did not, however, propose any rules of its own.[7]
 
 
 13
 By its own description, response to the Commission's Notice was "overwhelming". 50 F.C.C.2d 1, 2 (1974); J.A. 2. More than 100,000 comments were filed, filling 63 docket volumes, licensees and networks submitted extensive formal pleadings and programming data and, during 1972 and 1973, the Commission hosted three days of panel discussions and three days of oral argument during which representatives of the industry and members of the general public were afforded an opportunity to express their views regarding the full spectrum of children's television practices. See id. at 32-34; J.A. 49-51. ACT subsequently filed comprehensive reply comments, J.A. 125-87, in support of its essential position that "unless commercial pressures were eliminated, children would never receive adequate broadcast service."[8] Petitioner's Brief at 11.
 
 
 14
 In the wake of such manifestly widespread public support for ACT's proposed rules, and, perhaps, in apprehensive anticipation of possible agency adoption of those rules,[9] the broadcast industry undertook limited self-regulation. In 1971 the self-regulatory Code of the National Association of Broadcasters (NAB)[10] was reinterpreted to prohibit the use of certain possibly deceptive advertising techniques. A year later, the Code was amended to limit the proportion of time devoted to publicizing premium offers within any commercial to 50 percent, and the NAB Code authority voted to reduce, from 16 to 12 minutes per hour, the time which could be devoted to non-program material during children's programming. Subsequently, the NAB began to require that advertisements for breakfast cereals emphasize the importance of a balanced diet, that no advertisement encourage children to ingest immoderate amounts of candy and snack foods, and that children not be directly encouraged to pressure their parents into buying advertised products. See id. at 13-14.
 
 
 15
 These salutary reforms in the broadcast industry[11] reached their climax when, in June, 1974, after NAB officials had met privately with the Commission Chairman, the NAB Television Code adopted the following restrictions:
 
 
 16
 (1) Beginning in January, 1975, the Code would permit 10 minutes of non-program material per hour on Saturday and Sunday children's programs[12] and 14 minutes during the week; by January, 1976, the amount would be further reduced to 9 1/2 and 12 minutes, respectively;
 
 
 17
 (2) commercials for vitamins or drugs would be prohibited during children's programs;
 
 
 18
 (3) host or hero selling was to be restricted;
 
 
 19
 (4) program and advertising content was to be clearly separated by an "appropriate device"; and
 
 
 20
 (5) products advertised were to comport with generally accepted safety standards.
 
 
 21
 Id. at 16 (footnote added). Soon thereafter, the Association of Independent Television Stations (INTV)[13] followed suit and recommended that member-stations reduce the non-program content of children's programs to 9 1/2 minutes per hour by January 1, 1976.
 
 
 22
 These manifestations of industry willingness to improve the quality of children's television by self-regulation satisfied the Commission for the time being, and in October, 1974, it issued a Children's Television Report and Policy Statement, 50 F.C.C.2d 1 (1974); J.A. 1-63 (the Report ), which identified areas where improvement was necessary in children's television and which explained the Commission's decision not to adopt specific rules governing children's television practices at that time.
 
 B. The Report and Policy Statement
 
 23
 The Report addressed the issues raised during the proceedings in Docket 19142 from three related perspectives: (1) the Commission's authority to regulate programming and advertising practices generally; (2) broadcasters' previous performance in the area of children's television; and (3) the improvements expected of broadcasters if they were to meet their responsibilities to the child audience. It emphasized that broadcasters do have a special obligation to serve children.
 
 
 24
 As we have long recognized, broadcasters have a duty to serve all substantial and important groups in their communities, and children obviously represent such a group. Further, because of their immaturity and their special needs, children require programming designed specifically for them. Accordingly, we expect television broadcasters, as trustees of a valuable public resource, to develop and present programs which will serve the unique needs of the child audience.In this regard, educational or informational programming for children is of particular importance. It seems to us that the use of television to further the educational and cultural development of America's children bears a direct relationship to the licensee's obligation under the Communications Act to operate in the "public interest".
 
 
 25
 50 F.C.C.2d at 5; J.A. 7. The Commission determined, however, that for the time being rules establishing minimum quantitative levels of age-specific programming did not appear necessary.
 
 
 26
 While we are convinced that television must provide programs for children, and that a reasonable part of this programming should be educational in nature, we do not believe that it is necessary for the Commission to prescribe by rule the number of hours per week to be carried in each category. As noted above, we are involved in a sensitive First Amendment area, and we feel that it is wise to avoid detailed governmental supervision of programming whenever possible. Furthermore, while the amount of time devoted to a certain category of program service is an important indicator, we believe that this question can be handled appropriately on an ad hoc basis. Rules would, in all probability, have been necessary had we decided to adopt ACT's proposal to ban advertising from children's programs. As explained below, however, we have not adopted that proposal and it may be expected that the commercial marketplace will continue to provide an incentive to carry these programs.
 
 
 27
 Even though we are not adopting rules specifying a set number of hours to be presented, we wish to emphasize that we do expect stations to make a meaningful effort in this area. During the course of this inquiry, we have found that a few stations present no programs at all for children. We trust that this Report will make it clear that such performance will not be acceptable for commercial television stations which are expected to provide diversified program service to their communities.
 
 
 28
 Id. at 6; J.A. 8-9 (footnote omitted).
 
 
 29
 The Report noted that the Commission was just beginning to receive the complete data necessary to assay broadcasters' performance in children's programming through its new renewal form, FCC Form 303, which for the first time required the submission of information on the amount of programming primarily directed to children. It cautioned that "the question of rules (may) be revisited as we gain experience under the new form." Id. n. 6; J.A. 8 n. 6.
 
 
 30
 Turning to advertising practices, the Report emphasized that the Commission's responsibilities under the Act "include an obligation to insure that broadcasters do not engage in excessive or abusive advertising practices." Id. at 8-9; J.A. 12. However, since the FTC at that time was already formally inquiring into many of the advertising practices complained of by parties in the Docket 19142 proceedings, the Report did not address all of the promotional practices that had been objected to, noting that the Commission traditionally had deferred to the FTC in matters of false or deceptive advertising practices. It nevertheless did consider that an examination of broadcasters' responsibilities to the child audience was warranted in two specific areas: (1) the overall level of overcommercialization; and (2) the need for clearly separating programming from advertising content.
 
 
 31
 Concerning the problem of overcommercialization, the Report stated that the important, long-standing Commission policy against licensees devoting an excessive amount of broadcast time to advertising assumed an even greater significance with respect to children's programs:
 
 
 32
 Broadcasters have a special responsibility to children. Many of the parties testified and we agree, that particular care should be taken to insure that they are not exposed to an excessive amount of advertising. It is a matter of common understanding that, because of their youth and inexperience, children are far more trusting of and vulnerable to commercial "pitches" than adults. There is, in addition, evidence that very young children cannot distinguish conceptually between programming and advertising; they do not understand that the purpose of a commercial is to sell a product. See Report to the Surgeon General, Television and Growing Up: The Impact of Televised Violence, Vol. IV at 469, 474 (1970). Since children watch television long before they can read, television provides advertisers access to a younger and more impressionable age group than can be reached through any other medium. (citation omitted). For these reasons, special safeguards may be required to insure that the advertising privilege is not abused. As the Supreme Court stated, "(i)t is the interest of youth itself, and of the whole community that children be . . . safeguarded from abuses." Prince v. Massachusetts, 321 U.S. 158, 165 (64 S.Ct. 438, 88 L.Ed. 645) (1943).
 
 
 33
 Id. at 11; J.A. 15. Nevertheless, the Commission concluded that, notwithstanding the legitimate concerns about overcommercialization and other advertising abuses, abolishing advertising altogether from such programs would merely be self-defeating and, hence, not in the public interest.
 
 
 34
 Banning the sponsorship of programs designed for children could have a very damaging effect on the amount and quality of such programming. Advertising is the basis for the commercial broadcasting system, and revenues from the sale of commercial time provide the financing for program production. Eliminating the economic base and incentive for children's programs would inevitably result in some curtailment of broadcasters' efforts in this area. Moreover, it seems unrealistic, on the one hand, to expect licensees to improve significantly their program service to children and, on the other hand, to withdraw a major source of funding for this task.
 
 
 35
 Id.; J.A. 16.
 
 
 36
 The Commission also relied on what it considered the encouraging decisions of the NAB and INTV to restrict advertising voluntarily[14] as reasons for refusing, for the time being, to adopt the per se rules proposed by ACT. It took pains to make quite clear, however, that it was not simply abdicating its responsibilities in favor of ad lib industry self-regulation.
 
 
 37
 The standards adopted by the two associations are comparable to the standards which we would have considered adopting by rule in the absence of industry reform. We are willing to postpone direct Commission action, therefore, until we have an opportunity to assess the effectiveness of these self-regulatory measures. The Commission will expect all licensees, however, to review their commercial practices in programs designed for children in light of the policies outlined by the Commission and the standards now agreed upon by substantial segments of the industry, and to limit advertising to children to the lowest level consistent with their programming responsibilities. If it should appear that self-regulation is not effective in reducing the level of advertising, then per se rules may be required.
 
 
 38
 We emphasize that we will closely examine commercial activities in programs designed for children on a case-by-case basis. Overcommercialization by licensees in programs designed for young children will raise a question as to the adequacy of a broadcaster's overall performance. The Commission will, in addition, continually review broadcasters' performance on an industry-wide basis. If self-regulation does not prove to be a successful device for regulating the industry as a whole, then further action may be required of the Commission to insure that licensees operate in a manner consistent with their public service obligations.
 
 
 39
 Id. at 13-14; J.A. 18-20 (footnotes omitted; emphasis added). It also announced that it would soon amend its renewal form once again to elicit information from licensees regarding the time devoted to advertising during children's programs,[15] in order better to assess the effectiveness of self-regulation. At the same time, it warned that advertising in excess of the amounts proposed by the two industry groups "may raise a question as to whether the licensee is subordinating the interests of the child audience to his own financial interests." Id. at 14; J.A. 19.
 
 
 40
 Acknowledging the undesirability of particular advertising practices that had been addressed during the course of the rulemaking proceedings, such as "host selling", "tie-ins" and other product promotion ploys, the Report emphasized the need for maintaining a clear separation between program content and commercial message so as to avoid deceiving children, and detailed the special measures that broadcasters should undertake to meet their responsibilities in this regard. The Commission nevertheless again concluded that broadcasters should first be given an opportunity of proving that their own efforts would be effective in treating these problems.
 
 
 41
 Finally, the Commission stated that it expected the Report to have clarified broadcasters' responsibilities throughout this area.
 
 
 42
 We believe that in these areas every opportunity should be accorded to the broadcast industry to reform itself because self-regulation preserves flexibility and an opportunity for adjustment which is not possible with per se rules. In this respect, we recognize that many broadcasters may not currently be in compliance with the policies herein announced. Since this Report constitutes the first detailed examination of broadcasters' responsibilities to children, we do not wish to penalize the media for past practices. The purpose of this Report is to set out what will be expected from stations in the future.
 
 
 43
 Id. at 18; J.A. 26. However, since the Commission intended to evaluate improvements in children's television resulting from the industry's self-regulatory efforts, as it had repeatedly emphasized throughout the Report, the proceedings in Docket 19142 were left open.[16]
 
 C. Subsequent Developments
 
 44
 Following up upon its announced intention to obtain "adequate information on broadcasters' advertising practices in programs designed for children," id. at 13; J.A. 19, the Commission subsequently amended section IV-B of its broadcast renewal form, FCC Form 303, to elicit a variety of data on licensee's past and proposed commercial practices. 53 F.C.C.2d 161 (1975); J.A. 64-66. In so doing, the Commission again underscored its intention of closely monitoring broadcasters' efforts at self-regulation.The amendments . . . should enable us to determine, on a case-by-case basis, whether commercial television licensees are meeting their public service responsibilities in this area, by compliance with the industry's reform standards. Moreover, with regard to the efficacy of industry self-regulation, we cautioned in the Children's Television Report that although we were not adopting rules at that time, we did not foreclose the possibility of further action if industry self-regulation were to prove ineffective or inadequate. These amendments should also enable us to obtain data which "will serve in part, as a basis for determining whether self-regulation can be effective."
 
 
 45
 Id.; J.A. 64 (citation omitted).
 
 
 46
 Unsatisfied by these efforts, however, ACT filed a timely petition for reconsideration of the Report in which it advanced three basic policy recommendations. First, it argued that the Commission should adopt rules establishing specific amounts and percentages of time to be dedicated to children's programming,[17] better to ensure that broadcasters did make reasonable efforts to devote adequate amounts of time to such programming than the "unduly vague" guidelines set forth in the Report. Second, it again recommended that all advertising be prohibited during or adjacent to programs designed for pre-school aged children, inasmuch as they have difficulty in distinguishing program content from commercial message. Third, it proposed that the Commission officially encourage cooperative efforts by the networks to produce high-quality children's programs on a rotating basis. All three of these recommendations were rejected by the Commission: the first two on grounds that had been discussed extensively in the Report ; the last on grounds that the network-cooperation issue had not previously been raised or addressed in the Report and that, as a policy matter, the Commission's proper concern in the area of children's programming remained with the performance of individual broadcast licensees in the public interest. See J.A. 77. With its administrative remedies exhausted, ACT in effect now presses this court to compel the promulgation of specific rules along the lines it originally proposed.
 
 II. PROCEDURAL COMPLIANCE
 
 47
 ACT claims at the outset that the manner in which the Commission concluded these rulemaking proceedings "epitomizes abuse of the administrative process" by its failure to solicit public comment on the industry proposals for self-regulation negotiated "behind the closed doors of Chairman Wiley's office in a private meeting with NAB officials . . . (in which) the industry was clearly coerced into action under the threat of FCC regulation." Petitioner's Brief at 25. ACT contends that such action undermines the administrative process since it denies public participation at every stage of the regulatory process when issues of critical public importance are considered, frustrates effective judicial review, and renders the extensive comment-gathering stage "little more than a sop. . . ." Id. at 26-28.
 
 
 48
 In response the Commission argues preliminarily that ACT's procedural objections are not reviewable because neither ACT nor any other party raised them before the Commission through a petition for reconsideration. Government's Brief at 55-57. The literal language of section 405 of the Communications Act, 47 U.S.C. § 405 (1970), certainly supports this contention:
 
 
 49
 The filing of a petition for rehearing shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review . . . relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass.
 
 
 50
 Id. See also 47 C.F.R. § 1.429(j) (1976).
 
 
 51
 The purpose of section 405 is to afford the Commission the initial opportunity of correcting any errors, considering any newly discovered evidence, and generally passing upon all matters prior to their presentation to a reviewing court.[18] See Joseph v. FCC, 131 U.S.App.D.C. 207, 210, 404 F.2d 207, 210 (1968); Gerico Investment Co. v. FCC, 99 U.S.App.D.C. 379, 380, 240 F.2d 410, 411 (1957); Saginaw Broadcasting Co. v. FCC, 68 App.D.C. 282, 286, 96 F.2d 554, 558, cert. denied, 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938). The courts have generally given effect to this sound policy by holding that section 405 does preclude a review of objections not first raised before the Commission through a petition for rehearing. See, e. g., Neckritz v. FCC, 163 U.S.App.D.C. 409, 415, 502 F.2d 411, 417 (1974); Gross v. FCC, 480 F.2d 1288, 1290-1301 n. 4 (2d Cir. 1973); Green v. FCC, 144 U.S.App.D.C. 353, 359, 447 F.2d 323, 329 (1971); Hansen v. FCC, 134 U.S.App.D.C. 100, 102, 413 F.2d 374, 376 (1969). This exhaustion requirement is not an inflexible or arbitrary one, however; "it leaves room for the operation of sound judicial discretion to determine whether and to what extent judicial review of questions not raised before the agency should be denied." Great Falls Community TV Cable Co. v. FCC, 416 F.2d 238, 239 (9th Cir. 1969); see Joseph v. FCC, supra, 131 U.S.App.D.C. at 210, 404 F.2d at 210; Southland Industries, Inc. v. FCC, 69 App.D.C. 82, 86, 99 F.2d 117, 121 (1938). Nonetheless, we have insisted that the policy of administrative finality embodied in section 405 be departed from only "upon a showing of particular cause and sufficient justification in the public interest." WEBR, Inc. v. FCC, 136 U.S.App.D.C. 316, 323, 420 F.2d 158, 165 (1969).
 
 
 52
 ACT offers no justification for its failure to raise the issue of " closed door bargaining" in its petition for rehearing beyond unsupported conclusory assertions that it is "most unlikely" that the Commission would have attempted to cure its "error" had ACT in fact raised the issue in time for the Commission to do so. Petitioner's Reply Brief at 20-21. Such an assertion would be uncompelling in the absence of any concrete indication that reconsideration would have been futile, cf. Office of Communication of United Church of Christ v. FCC, 150 U.S.App.D.C. 339, 344, 465 F.2d 519, 524 & n. 17 (1972), and, in other circumstances, we would be constrained from entertaining the objection. That objection, however, essentially alleging a denial of administrative due process, raises neither a novel factual issue for which an initial Commission determination is quite clearly both necessary and appropriate, nor a legal issue on which the Commission, see, e. g., Rules Governing Ex Parte Communications, 1 F.C.C.2d 49 (1965), and even this court, see Courtaulds (Alabama) Inc. v. Dixon, 111 U.S.App.D.C. 115, 294 F.2d 899 (1961); see generally Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 269 F.2d 221 (1959), has not already made known its general views to the contrary. Thus, we believe that a thorough airing of the merits of ACT's procedural challenge would not be inappropriate in this case, especially in light of the agency's tentative conclusion of these informal rulemaking proceedings shortly after ex parte discussions with regulatee representatives.
 
 
 53
 ACT's characterization of the Commission's action as an abuse of the administrative process misconceives the agency's role in, and the flexibility of, the informal rulemaking proceeding through which the Commission explored the issues raised by ACT's petition.[19] In informal rulemaking, an agency must publish notice in the Federal Register of the proposed proceeding, including "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3) (1970). Since the public is generally entitled to submit their views and relevant data on any proposals, the notice "must be sufficient to fairly apprise interested parties of the issues involved . . . ," S. Doc. No. 248, 79th Cong., 2d Sess. 258 (1946), but it need not specify "every precise proposal which (the agency) may ultimately adopt as a rule." California Citizens Band Ass'n v. United States, 375 F.2d 43, 48 (9th Cir.), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). See also Logansport Broadcasting Corp. v. United States, 93 U.S.App.D.C. 342, 346, 210 F.2d 24, 28 (1954). The notice publicizing the proceedings on the issues raised by ACT was sufficiently specific, in light of the result, to meet these requirements. The possibility of Commission reliance on industry self-regulation could not have first suggested itself to ACT only when the Commission finally issued its Report. The Commission has traditionally relied upon self-regulation when it comes to programming matters.[20] Moreover, the Notice of Inquiry and Proposed Rulemaking in Docket 19142 specifically requested comments on the "provisions of the NAB Television Code and its guidelines" concerning restrictions on commercials, 28 F.C.C.2d at 372, J.A. 120, and the industry urged from the outset of these proceedings, in public comments available to ACT, that self-regulation was the only appropriate avenue for corrective action. See, e. g., J.A. 196-219 (comments of NAB).
 
 
 54
 In addition to notice, an agency must permit meaningful public participation by giving "interested parties an opportunity to participate in the rule making through a submission of written data, views, arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c) (Supp. V 1975). The procedures available to satisfy this requirement are correspondingly diverse, though less so than formerly. No hearing is usually required,[21] and generally no procedural uniformity is imposed. 1 K. Davis, Administrative Law Treatise § 6.01, at 360-61 (1958). The more limited procedural safeguards in informal rulemaking are justified by its more wide-ranging functional emphasis on questions of law, policy and legislatively-conferred discretion rather than on the contested facts of an individual case. See 1 Davis, supra at 413. The issues facing the Commission in the proceeding sub judice were clearly of a legislative nature, policy considerations predominated, and any rules ultimately adopted would have affected the television and advertising industries, and a significant proportion of television programming.
 
 
 55
 Under section 553, then, ACT and other interested members of the public, including industry representatives, were entitled to a reasonable opportunity to comment and submit data in support of, or in opposition to, the rules proposed. The Commission substantially met this requirement by permitting a lengthy period for the submission of written comments and by holding six days of informal panel discussions and formal oral arguments. The information gathered by the Commission during this informal rulemaking process, along with any information put forth by the agency itself, represent the factual basis on which the agency must necessarily proceed in making its final determination. This factual predicate must be limited in this way in order to give interested parties proper notice of the reasoning behind the agency's actions and to give meaning to the right to submit comments on the proposed rule. While the agency must consider, analyze and rely on these factual materials which are in the public domain, the agency may draw upon its own expertise in interpreting the facts or upon broader policy considerations not present in the record. We believe that the Commission operated within this framework in this case.[22]
 
 
 56
 We do not consider that ACT's lack of opportunity to respond directly to NAB's specific self-regulatory proposals vitiated the Commission's decision to accept tentatively those proposals, as indicia that self-regulation could prove effective, in lieu of adopting specific rules. On balance, the procedures used by the Commission constitute substantial compliance with the APA's mandate of limited, yet meaningful, public participation. See Texaco, Inc. v. FEA,531 F.2d 1071, 1081-82 (Em.App.), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).
 
 
 57
 The Commission's treatment of the various issues and its extended explanation for the action taken detailed in the Report show that ACT's participation in these proceedings was not just pro forma, and that its submissions were not simply ignored. We have long recognized that any judicial review of administrative action cannot be meaningfully conducted unless the court is fully informed of the basis for that action. See, e. g., P.A.M. News Corp. v. Hardin, 142 U.S.App.D.C. 227, 231, 440 F.2d 255, 259 n. 6 (1971). Such review is facilitated by section 553's requirement that an agency incorporate in any rules adopted a statement of their basis and purpose, "(a)fter consideration of the relevant matter presented . . . ." 5 U.S.C. § 553(c) (Supp. V, 1975). In Rodway v. United States Dept. of Agriculture, 168 U.S.App.D.C. 387, 514 F.2d 809 (1975), we once again explained the full import of this particular statutory requirement in cautioning that
 
 
 58
 (t)he basis and purpose statement is not intended to be an abstract explanation addressed to imaginary complaints. Rather, its purpose is, at least in part, to respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule.
 
 
 59
 Id. at 395, 514 F.2d at 817.
 
 
 60
 Here, notwithstanding that no rule was adopted[23] into which the Commission might "incorporate" its basis and purpose, the Commission did explain the reason for its decision to rely for the time being on self-regulation rather than specific rules. This explanation is contained in the record now before us, and it furnishes a basis for effective judicial review.[24]
 
 
 61
 In holding that ACT's position was not prejudiced by the manner in which the Commission pursued the temporary resolution of these proceedings, we wish to emphasize that we are not insensitive to ACT's disenchantment with what it considered to be the agency's undue deference to the interests of those it was created to regulate. Meaningful public participation is always to be encouraged, since, at the very least, it "(p)ermits administrative agencies to inform themselves and to afford adequate safeguards to private interests." Final Report of the Attorney General's Committee on Administrative Practice 103 (1941), quoted in S. Doc. No. 248, 79th Cong., 2d Sess. 19-20 (1946). See Bonfield, Public Participation in Federal Rulemaking Relating to Public Property, Loans, Grants, Benefits, or Contracts, 118 U.Pa.L.Rev. 540, 540-49 (1970). We previously have warned that "when Congress creates a procedure that gives the public a role in deciding important questions of public policy, that procedure may not lightly be sidestepped by administrators." Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 84, 439 F.2d 584, 594 (1971);[25] see, e. g., Office of Communication of the United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966); id., 138 U.S.App.D.C. 112, 425 F.2d 543 (1969) (reversing agency's decision on remand). Nevertheless, while it may have been impolitic for the Commission not to invite further comment on the NAB's proposals, especially in view of the fact that there was no necessity for deciding these difficult issues quickly, we still cannot say that the Commission abused its discretion in deciding not to,[26] but see Consolidated Rail Corp. v. United States, 185 U.S.App.D.C. --- at --- n. 66, 567 F.2d 64 at 83 (1977) (Wright, J., dissenting), nor are we persuaded that ACT's interests in these proceedings were inadequately protected, much less subverted, by the Commission's action.[27]
 
 
 62
 In so concluding, we necessarily are confronted with the recent decision of this court in Home Box Office, Inc. v. FCC, 185 U.S.App.D.C. ---, 567 F.2d 9 (1977) (opinion concurring specially filed by Circuit Judge MacKinnon on May 20, 1977), petition for cert. filed, 45 U.S.L.W. 3808 (U.S. Jun. 4, 1977) (No. 76-1724), which painted a new perspective on ex parte contacts with a rather broad jurisprudential brush. The gist of the Home Box Office ex parte ruling was set forth as follows:
 
 
 63
 Once a notice of proposed rulemaking has been issued . . . any agency official or employee who is or may reasonably be expected to be involved in the decisional process of the rulemaking proceeding, should "refus(e) to discuss matters relating to the disposition of a (rulemaking proceeding) with any interested private party, or an attorney or agent for any such party, prior to the (agency's) decision * * *," Executive Order 11920, § 4, supra, at 1041. If ex parte contacts nonetheless occur, we think that any written document or a summary of any oral communication must be placed in the public file established for each rulemaking docket immediately after the communication is received so that interested parties may comment thereon. Compare Executive Order 11920, § 5, supra.
 
 
 64
 Home Box Office, supra at ---, 567 F.2d at 57. Executive Order 11920, which the opinion quotes and essentially adopts as an overarching principle of administrative law, is an executive branch prohibition of ex parte contacts with White House staffers regarding international air route allocations when such route certifications are before the President for approval. See id. at ---, 567 F.2d at 56.
 
 
 65
 For the reasons set forth below, we agree with Judge MacKinnon that the above-quoted rule should not apply as the opinion clearly would have it to every case of informal rulemaking. Home Box Office, supra (opinion concurring specially filed May 20, 1977). However, notwithstanding our views to the contrary, we hold only that Home Box Office's broad proscription is not to be applied retroactively in the case sub judice inasmuch as it constitutes a clear departure from established law when applied to informal rulemaking proceedings such as undertaken in Docket 19142. See generally Linkletter v. Walker, 381 U.S. 618, 627-29, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); Great Northern Railway Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932).
 
 
 66
 In the absence of support for its position in the Administrative Procedure Act,[28] the panel in Home Box Office justified its extension of an ex parte prohibition/disclosure rule throughout all manner of informal rulemaking by reasoning from our decision in Sangamon Valley Television Corp., supra, where we held that ex parte contacts by interested parties with FCC members regarding the allocation of specific TV channels vitiated the ultimate allocation decision. That particular case was neither discussed nor cited by the parties now before the court at any point in their briefs, presumably because even petitioner, ACT, considered the case distinguishable. Although Sangamon did involve informal rulemaking, as opposed to licensing-by-adjudication, the court there agreed that "whatever the proceeding may be called it involved not only allocation of TV channels among communities but also resolution of conflicting private claims to a valuable privilege (i. e., a TV channel), and that basic fairness requires such a proceeding to be carried on in the open." Id., 269 F.2d at 224 (emphasis added). Surely this is good law, especially in view of the fact that channel allocation via informal rulemaking is rather similar functionally to licensing via adjudication. The proceedings in Docket 19142, however, present a different situation entirely, where the informal rulemaking undertaken did not involve such "conflicting private claims to a valuable privilege" but rather the possible formulation of programming policy revisions of general applicability. Nonetheless, Home Box Office would prohibit or require publication and opportunity for comment on all ex parte contacts, no matter how minor, during the notice and comment stage regardless of the nature of the inquiry. The novelty of this requirement should have been apparent to all.
 
 
 67
 In so applying Sangamon, the panel in Home Box Office had to clear one substantial hurdle of decisional law: this court's decision two years after Sangamon in Courtaulds (Alabama) Inc., supra, where we held that an FTC rule generically defining a certain fiber as "rayon" was not voided by the agency's acceptance of ex parte materials supplied by the manufacturer-plaintiff's competitors. The court in Courtaulds stated:
 
 
 68
 Appellant relies upon Sangamon Valley Television Corp. v. United States . . . . That opinion is completely distinguishable on its face and in principle. The instant case in no way involves a license to be available to only one competing applicant nor is there a suggestion here of what "competitors" are advantaged by the Commission's adoption of the broad generic category "rayon". Moreover, the instant proceeding clearly was one of rule making, both in form and in substance, and hence was not subject to all the restrictions applicable to a quasi-judicial hearing. And see Van Curler Broadcasting Corp. v. United States (98 U.S.App.D.C. 432, 236 F.2d 727). . . .
 
 
 69
 Id., 294 F.2d at 904-05 n. 16.
 
 
 70
 Home Box Office distinguished Courtaulds in two ways: 1) by referring to the fact that in both Home Box Office and Sangamon "the substance of the contacts was kept secret" whereas in Courtaulds the court found "no evidence that the Commission improperly did anything in secret or gave to any interested party advantages not shared by all . . ." id. at 904-05; and 2) by noting that Courtaulds did not involve resolution of competing claims to a valuable privilege. See Home Box Office, supra, 185 U.S.App.D.C. at --- n. 124, 567 F.2d at 56. Of course, these bases for distinguishing Courtaulds from Home Box Office also distinguish our present case with the same and perhaps even greater force.[29]
 
 
 71
 On the other hand, the Home Box Office opinion does not discuss the case cited in the Courtaulds footnote quoted above, Van Curler Broadcasting Corp. v. United States, 98 U.S.App.D.C. 432, 236 F.2d 727 (en banc), cert. denied, 352 U.S. 935, 77 S.Ct. 226, 1 L.Ed.2d 163 (1956). In this en banc decision we held that certain ex parte contacts between Commission members and CBS representatives during informal rulemaking proceedings on a TV channel assignment did not invalidate the Commission's subsequent allocation.
 
 
 72
 (I)t appears that these calls and conversations were in regard to the nation-wide intermixture problem, concerning which the Commission was seeking all sorts of advice and information preparatory to setting up a general nation-wide rule-making proceeding to deal with intermixture. We find nothing improper or erroneous in the Commission's consideration of these interviews as depicted in this record.
 
 
 73
 Id. at 730. While the rulemaking in Van Curler was limited to one particular channel assignment, the "nation-wide intermixture problem" was not irrelevant to that proceeding. The petitioners were UHF licensees complaining of the allocation of a VHF channel to a community in their area of service, and FCC intermixture policy would perforce have served as an all-important background for this rulemaking action. The court in Sangamon distinguished Van Curler thusly:
 
 
 74
 The Commission's opinion denying the petitioner's request to reopen the record shows that the Commission did not consider these interviews in connection with the particular channel assignment that was before us for review.
 
 
 75
 269 F.2d at 224 n. 6. While the meaning of this statement is not entirely clear, it appears to say that because the Commission said it was not influenced by the ex parte contacts the reviewing court need not presume otherwise a position not in harmony with the presumption of agency irregularity implicitly underwritten by the Home Box Office decision. Compare Home Box Office, supra, 185 U.S.App.D.C. at ---, 567 F.2d at 54. We do not propose to argue that Van Curler stands for the proposition that ex parte contacts always are permissible in informal rulemaking proceedings they are of course not but we do think it can be read as supporting the proposition that ex parte contacts do not per se vitiate agency informal rulemaking action, but only do so if it appears from the administrative record under review that they may have materially influenced the action ultimately taken.
 
 
 76
 On the other hand, though, we have Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) a somewhat Delphic opinion concerning informal administrative action rather than informal rulemaking which we believe as a practical matter should not be read as mandating that the public record upon which our review is based reflect every informational input that may have entered into the decisionmaker's deliberative process. See National Courier Ass'n v. Board of Governors of Federal Reserve System, 170 U.S.App.D.C. 301, 314, 516 F.2d 1229, 1242 (1975) ("Unless he has left no other record of the reasons for his decision, the mental processes of an administrator may not be probed."); National Nutritional Foods Ass'n v. FDA, 491 F.2d 1141 (2d Cir. 1974), cert. denied, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975).
 
 
 77
 If we go as far as Home Box Office does in its ex parte ruling in ensuring a "whole record" for our review, why not go further to require the decisionmaker to summarize and make available for public comment every status inquiry from a Congressman or any germane material say a newspaper editorial that he or she reads or their evening-hour ruminations? See generally Davis, supra § 13.12 (Supp.1970). In the end, why not administer a lie-detector test to ascertain whether the required summary is an accurate and complete one? The problem is obviously a matter of degree, and the appropriate line must be drawn somewhere. In light of what must be presumed to be Congress' intent not to prohibit or require disclosure of all ex parte contacts during or after the public comment stage, see note 27, supra, we would draw that line at the point where the rulemaking proceedings involve "competing claims to a valuable privilege." Home Box Office, supra, 185 U.S.App.D.C. at ---, 567 F.2d at 61 (MacKinnon, J., concurring specially). It is at that point where the potential for unfair advantage outweighs the practical burdens, which we imagine would not be insubstantial, that such a judicially conceived rule would place upon administrators.[30] As Judge Leventhal has cautioned in American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 315, 359 F.2d 624, 629, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966):
 
 
 78
 (R)ule making is a vital part of the administrative process, particularly adapted to and needful for sound evolution of policy . . . (and) is not to be shackled, in the absence of clear and specific Congressional requirement, by importation of formalities developed for the adjudicatory process and basically unsuited for policy rule making.
 
 
 79
 See also Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 208-13, 407 F.2d 330, 338-43 (1968).
 
 
 80
 In sum, we believe that the nature of the proceedings in Docket 19142 was not of the kind that made this rulemaking action susceptible to poisonous ex parte influence. Private groups were not competing for a specific valuable privilege. Furthermore, this case does not raise serious questions of fairness. Chairman Wiley met with representatives of NAB, as Chairman Burch had met with representatives of ACT, and there is no indication that he "gave to any interested party advantages not shared by all." Home Box Office, supra, 185 U.S.App.D.C. at ---- n. 124, 567 F.2d at 56, quoting Courtaulds (Alabama) Inc., supra, 294 F.2d at 905. Nor is it a case, as Home Box Office was, where the FCC "offers us no facts at all that would tend to rebut the clear import of amicus' statements that ex parte contacts shaped the ultimate form of the . . . rules." Home Box Office, supra at --- n. 107, 567 F.2d at 52. Not only were no rules adopted for the time being in our case, but the Commission's Children's Television Report demonstrates that the agency in good faith examined all the relevant factors raised during the comment stage, and comprehensively and rationally justified its decision to proceed cautiously by giving industry self-regulation a chance to prove that it could be effective.[31]
 
 
 81
 ACT's real dispute, of course, is with the merits of the Commission's decision not to promulgate rules, a subject to which we now turn.
 
 III. REVIEW OF THE MERITS
 
 82
 ACT challenges the Commission's interpretation of the Communications Act's public interest standard[32] in light of the record compiled during the notice and comment proceedings in Docket 19142. In all cases of reviewable administrative action, "(i)t is the necessary and proper task of this court to undertake a careful and deliberate scrutiny of an agency's decisions to insure compliance with law and the legislative mandate." Office of Communication of United Church of Christ v. FCC, 150 U.S.App.D.C. 339, 344, 465 F.2d 519, 524 (1972). In this case, however, we need not determine whether the Commission's action is supported by substantial evidence in the record for neither the Act nor any agency regulation requires an evidentiary hearing as a condition precedent to Commission rulemaking.[33] Rather the proper standard of review for informal rulemaking action is the far less demanding one specified by subsections 706(2)(A)-(D) of the APA, 5 U.S.C. §§ 706(2)(A)-(D) (1970), which requires a reviewing court to set aside agency action deemed to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A). See Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); National Ass'n of Food Chains v. ICC, 175 U.S.App.D.C. 346, 351-52, 535 F.2d 1308, 1313-14 (1976). In applying this standard we ought not to be either pusillanimous or overbearing. We cannot substitute our judgment for the agency's, and our review is confined to a determination of whether the challenged action was based on "consideration of the relevant factors" and is supported by a reasoned opinion. In other words, we can only fault the agency's decision if it manifests a clear error of judgment. Citizens to Preserve Overton Park, supra, 401 U.S. at 416, 91 S.Ct. 814. In sum, we must sustain the Commission's decision that the public interest does not require the promulgation of specific rules for the time being, if it violates no law, is blessed with an articulated justification that makes a "rational connection between the facts found and the choice made,"[34] and follows upon a "hard look" by the agency at the relevant issues.[35]
 
 
 83
 We agree with the Commission that its decision not to adopt specific regulations governing advertising and programming practices for children's television was a reasoned exercise of its broad discretion.[36] The Supreme Court has emphasized that the Commission's construction of its own governing statute "should be followed unless there are compelling indications that it is wrong . . .," Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969), and we have recognized that
 
 
 84
 in a statutory scheme in which Congress has given an agency various tools with which to protect the public interest, the agency is entitled to some leeway in choosing which jurisdictional base and which regulatory tools will be most effective in advancing the Congressional objective.
 
 
 85
 Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 100, 359 F.2d 282, 284 (1966). As a corollary of this broad general discretion, the Commission has considerable latitude in responding to requests to institute proceedings or to promulgate rules, even though it possesses the authority to do so should it see fit. "Administrative rule making does not ordinarily comprehend any rights in private parties to compel an agency to institute such proceedings or promulgate rules." Rhode Island Television Corp. v. FCC, 116 U.S.App.D.C. 40, 44, 320 F.2d 762, 766 (1963); see NAACP v. FPC, 172 U.S.App.D.C. 32, 47, 520 F.2d 432, 447 n. 53 (1975), aff'd, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976); Mackey v. United States, 103 U.S.App.D.C. 146, 255 F.2d 898, 899 (1958). There may be situations in which exceptions to this general rule governing the promulgation of rules are warranted,[37] but this case is not one.
 
 
 86
 ACT concedes that we must exercise restraint in reviewing policymaking action by the Commission, but argues that "(t)he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia . . . ." Petitioner's Brief at 23, quoting American Ship Building Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965). We, of course, have no quarrel with this proposition; we simply are not persuaded that the Commission's decision not to issue rules at this time was arbitrary, irrational or biased in favor of industry interests. While we believe that the Commission may well have adequate authority to regulate in this area, and even perhaps to the extent proposed by ACT, we see no compelling reason why the Commission should not be allowed to give the industry's self-regulatory efforts a reasonable period of time to demonstrate that they will be successful in rectifying the inadequacies of children's television identified in the Report. Cf. Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 121-23, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); National Broadcasting Co. v. United States, 319 U.S. 190, 225, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).
 
 
 87
 The Commission's decision was not an abrupt departure from past policies.[38] Its Report has simply clarified the efforts expected of broadcast licensees in fulfilling their public interest obligations to the child audience.[39] Furthermore, the Commission has detailed the significant first amendment and policy problems that inhere in regulation of programming and advertising practices and militate against an immediate adoption of rules, such as urged by ACT, and we cannot say that it erred in concluding that they counselled a more cautious approach. Heeding that counsel, the Commission has chosen to accord licensees a substantial measure of their customary discretion in the areas of programming and advertising decisions, and yet it has made it quite clear that general improvements must be forthcoming in the time devoted to advertisements, in separation of advertisements from program content, and in increased educational or informative programming.[40]
 
 
 88
 ACT argues that attempts to substitute industry self-regulation for specific rules or standards against which licensee performance may be accurately tested have been historically ineffective. Referring us to experience with the Commission's Blue Book[41] and Editorializing Report,[42] ACT predicts that the Report "is likely to fall between the same regulatory cracks to become another ineffective, unenforced policy statement." Petitioner's Brief at 40. Whether or not this prediction ultimately proves accurate, we do not consider the results flowing from these far more general statements of Commission policy, irrespective of how one interprets them, to be an adequate basis for judicial nullification of the self-regulatory efforts underwritten by the Report. It is true that self-regulation has not always worked out as desired, but this does not mean that self-regulation has never worked or that it cannot work in this case. Much, we suppose, depends on the degree to which such efforts are focused on specific problems and the extent to which the Commission and the public monitor the level of actual performance. We believe that the Report promises reasonable success from both standpoints.
 
 
 89
 ACT also argues that Commission reliance on action by the NAB and INTV is presumptively ineffective because these associations have only limited participation[43] and no real enforcement power.[44] Petitioner's Brief at 40-43. We believe that this misses the point, however. The Commission is not relying on these industry groups, with whatever enforcement mechanisms may be at their disposal to rehabilitate errant members, as "chosen agent(s)" to vivify and sustain the policies established in the Report. Compare id. at 42. Rather, the Commission emphasized the public interest obligation of every licensee to respond in good faith to these policies. See 50 F.C.C.2d at 14; J.A. 18. The Commission's emphasis on the self-regulatory actions taken by the NAB and the INTV during these rulemaking proceedings was hardly a recognition on its part that they sufficed to resolve all the concerns raised during the public comment stage and later addressed in the Report. That emphasis was placed to demonstrate that industry self-regulation was not a mere will-o-the-wisp, but rather an encouraging sign that it would be sufficiently responsive to obviate the need for substantial governmental intrusion into areas in which, for good reasons, licensees traditionally have exercised considerable discretion.
 
 
 90
 The Commission did not act arbitrarily or otherwise abuse its broad discretion in declining to adopt ACT's proposed rules as its own, or, for that matter, in declining to adopt any rules whatsoever for the time being. It has set forth its views in this area in a thorough and detailed manner. Its Report manifests a reasoned consideration of the issues raised during these proceedings and contains clearly stated conclusions which justify the approach taken. Our review may take us no further.
 
 IV. CONCLUSION
 
 91
 We might occasionally wish that judges were imbued with legislative powers as well, but we know that under our constitutional system of government we are not. Our authority is limited, both constitutionally and by statute, and this is no less true when we sit in review of the orders of administrative agencies. The Commission, as the expert agency entrusted by Congress with the administration and regulation of the crucial, dynamic communications field, requires and deserves some latitude in carrying out its substantial responsibilities. It may not be the sole guardian of the public's interest in broadcasting licensees, the courts and the general public in varying ways share responsibility with it for defining and advancing that interest but, in the formulation of broadcast policy, the Commission nevertheless must continue to play a leading role.
 
 
 92
 If our relationship with the Commission and other federal agencies is to remain a partnership, we may not succumb to the temptation of casting ourselves in the unsuited role of primus inter pares. Rather, our function in passing upon these particular proceedings must come to an end once we have concluded that the Commission's action was a reasoned exercise of its discretion. Having so concluded upon a careful review of the record before us, the order of the Commission challenged by ACT herein is
 
 
 93
 Affirmed.
 
 
 
 [1]
 Jurisdiction in this court derives from section 402(a) of the Communications Act of 1934, 47 U.S.C. § 402(a) (1970), and 28 U.S.C. § 2342(1) (Supp. V 1975), petitioner's interests being adversely affected by, and this appeal brought to determine the validity of, a final order of the FCC
 
 
 [2]
 Regulations governing rulemaking proceedings before the Commission are codified at 47 C.F.R. § 1.400 et seq. (1976)
 
 
 [3]
 In its brief, ACT claims that 5,000 letters and memoranda were filed in support of its proposals, Petitioner's Brief at 9, whereas the FCC apparently received only 2,000. See J.A. 117. In any case, only a few letters from non-industry parties opposed ACT's proposals, generally on the ground that proper parental control over their children's viewing habits would suffice. See id. ACT subsequently filed two empirical studies of children's programming and advertising practices and detailed reply comments to opposing arguments
 
 
 [4]
 In opposing ACT's petition, industry members raised a number of basic objections: (1) that the various proposals, if adopted, would violate both the first amendment rights of the licensees and the censorship prohibition of 47 U.S.C. § 326 (1970); (2) that they were inconsistent with the FCC's long-standing policy of leaving programming decisions to the judgment of the licensee so long as those decisions were consistent with the public interest; (3) that they were practicably unworkable because of the difficulty in defining and classifying children's programs; (4) that prohibition of commercial sponsorship would only result in a self-defeating reduction in children's programming for want of adequate funding; (5) that self-regulation by means of the NAB Code had been and would continue to be fully capable of dealing with any problems in this area; and, finally, (6) that the FCC should not endeavor to substitute its judgment for that of children's parents. Government's Brief at 5 n. 1; J.A. 117. Several of these arguments ultimately were adopted by the Commission, itself, as justification for its decision not to adopt any of the proposed rules for the time being
 
 
 [5]
 The FCC specifically stated in accepting ACT's petition for rulemaking:
 We recognize the importance and significance of these pronouncements (objecting to the proposed rules) and the concepts expressed in them. It may be that, ultimately, we will conclude that they substantially limit otherwise appropriate Commission action in this area. But it is also apparent that there are high public interest considerations involved in the use of television . . . in relation to a large and important segment of the audience, the nation's children. The importance of this portion of the audience, and the character of material reaching it, are particularly great because its ideas and concepts are largely not yet crystallized and are therefore open to suggestion, and also because its members do not yet have the experience and judgment always to distinguish the real from the fanciful.
 
 
 [28]
 F.C.C.2d at 370-71; J.A. 118 (emphasis added)
 
 
 [6]
 The FCC solicited comments on the following general questions:
 
 
 [1]
 What types of children's programs not now available do parties believe commercial TV stations should present?
 
 
 [2]
 To what extent, generally and with respect to particular programs and types of programs, does "children's programming" have benefits to children beyond the fact that it holds their interest and attention and thus removes the need for other activity or parental attention?
 
 
 [3]
 What, generally speaking, is a definition of "children's programming" which could serve for the Commission's use in this connection? To what extent do children, particularly in the higher age groups mentioned by ACT, view and benefit from general TV programming?
 
 
 [4]
 What restriction on commercials short of prohibition e. g. on types of products or services, what can be said, number, divorcement from program content, etc. would be desirable? Comments should take into account in this connection the provisions of the NAB Television Code and its guidelines
 
 
 [5]
 To what extent should any restriction on commercial messages in children's programs also apply to such messages adjacent to children's programs?
 Id. at 371-72; J.A. 120.
 
 
 [7]
 The wide-ranging inquiry of the FCC's rulemaking proceeding in Docket 19142 did not include the additional related issues of violence and obscenity in television programming generally. These problems, however, were to be considered by the Commission in a report to the House and Senate Committees on Appropriations, due Dec. 31, 1974. See J.A. 2 n. 1
 
 
 [8]
 ACT's argument in support of this position was, in its own words, as follows:
 Since the amount charged for each minute of commercial time increased with the size of the audience, and the audience for children's programs is naturally limited, it was a financial imperative to design programs with the broadest possible appeal, attracting all children from 2 to 12 years old. The easiest and cheapest way to accomplish this was with loud, fast, crude and violent programs, as opposed to age-specific, informational or educational programming. The latter was more expensive and difficult to produce and had a narrower audience.
 Petitioner's Brief at 11.
 
 
 [9]
 Potential congressional action during this period also may have fanned the flickering flame of industry reform. In early 1974, for instance, three separate committees of Congress questioned the FCC's Chairman about his agency's dilatoriness in acting upon ACT's rulemaking petition. See id. at 15 n. 18
 
 
 [10]
 Approximately 400 commercial television licensees, or about 60% of all such stations, subscribed to the NAB Code during this period. Id. at 41 n. 61
 
 
 [11]
 These reforms were paralleled to some extent by advertisers themselves. Three large pharmaceutical companies, for instance, announced during 1972 that they intended to stop advertising their drugs during children's programs. Furthermore, in May of 1974, representatives of the advertising industry set up a children's advertising unit within the National Advertising Review Board, although apparently no specific rules were ever adopted nor any other self-regulatory action ever taken. See id. at 14 & n. 17
 
 
 [12]
 The NAB Code defines children's programs as those broadcast at "hours other than prime time in which programs initially designed primarily for children under 12 years of age are scheduled." Id. at 16 n. 22
 
 
 [13]
 The INTV is comprised of some 50 independent television stations. Unlike the NAB, it has no Code. Self-regulatory powers are limited to the making of recommendations to its members. See id. at 42
 
 
 [14]
 The Commission recognized that, of course, not every commercial television licensee belonged to either the NAB or the INTV. It emphasized, however, that "the Commission expects all licensees to make a good faith effort to bring their advertising practices into conformance with the policies established herein over the period preceding January 1, 1976." 50 F.C.C.2d at 14 n. 13; J.A. 19 n. 13
 
 
 [15]
 Pursuant to this announcement in the Report, the FCC amended its broadcast license renewal form to acquire information on licensees' commercial practices after Jan. 1, 1976 on programs designed for children. Memorandum Opinion and Order re Renewal Form Amendments, 53 F.C.C.2d 161 (1975)
 
 
 [16]
 All seven FCC Commissioners concurred in the result reached in the Report, although three issued separate statements. 50 F.C.C.2d at 1; J.A. 1, 52-63. Commissioner Hooks concurred "in essence" with the Report, but would have set a lower limit of advertising minutes per hour than that established by either of the two industry associations and would have required that commercials be "clustered" before and after children's programs to avoid undue suggestiveness. 50 F.C.C.2d at 35-36; J.A. 54-55. Commissioner Washburn also would have clustered commercials. Id. at 36; J.A. 55. Commissioner Robinson, on the other hand, believed that "the Commission has gone about as far as appropriate, in light of the evidence presently before (it) and mindful of the ever-present dangers that lurk in the area of program regulation." Id. at 37; J.A. 56. He also suggested that "we candidly acknowledge that within proper limits (advertising) is not a sin, and certainly not a crime, to try to influence the consumption desires of children." Id. at 39; J.A. 61
 
 
 [17]
 Specifically, petitioner urged the Commission to adopt a rule requiring broadcasters to carry 12 hours of children's programming per week, of which 20% would be dedicated to education and instructional programs. See J.A. 71
 
 
 [18]
 In this respect the policy embodied by § 405 is congruent with that underlying the broader non-statutory exhaustion of administrative remedies doctrine which a reviewing court would confront even in the absence of any statutory exhaustion requirement. As Chief Justice Vinson explained in Unemployment Compensation Comm. v. Aragon, 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136 (1946):
 A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action.
 Id. at 155, 67 S.Ct. at 251. See United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952); Joseph E. Seagram & Sons, Inc. v. Dillon, 120 U.S.App.D.C. 112, 114, 344 F.2d 497, 499 (1965).
 
 
 [19]
 Congress has not specified the method by which the Commission must acquire and assess the data relevant to its determination of what is in the public interest, beyond the procedural requirements of the APA. Certainly it has not seen fit to give interested persons the right to an "adjudicatory" hearing in proceedings such as Docket 19142 where the determinations to be made are essentially legislative and the interests involved are both complex and widely disparate. Compare 5 U.S.C. § 553(c) (Supp. V 1975) with United States v. Fla. East Coast Ry., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972) and 47 U.S.C. §§ 303(r), 403, 409(c) (1970). If it had, petitioner's opportunity for participation of course would be much greater, and would include, we should think, the opportunity to rebut directly the specific proposals offered by NAB officials
 This is not to say that the well-recognized distinction between informal rulemaking and adjudications or formal rulemaking "on the record", see Fla. East Coast Ry., supra, 410 U.S. at 245, 93 S.Ct. 810, is an appropriate guide to administrative decision-making in every case. Occasionally it is not. In Mobil Oil Corp. v. FPC, 157 U.S.App.D.C. 235, 483 F.2d 1238 (1973), for instance, we recognized that informal rulemaking under § 553 might require certain adversary procedures akin to adjudications or formal rulemaking when circumstances, such as often obtain in rate-making cases, made them appropriate. On other occasions, we also have required more limited procedures in addition to those specified in § 553. See, e. g., International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615 (1973) (requiring public oral argument); Kennecott Copper Corp. v. EPA, 149 U.S.App.D.C. 231, 462 F.2d 846 (1972) (requiring a statement of reasons for rule); Walter Holm & Co. v. Hardin, 145 U.S.App.D.C. 347, 354, 449 F.2d 1009, 1016 (1971) (requiring public oral argument). See generally Williams, "Hybrid Rulemaking" Under the Administrative Procedure Act: A Legal and Empirical Analysis, 42 U.Chi.L.Rev. 410 (1975); Note, The Judicial Role in Defining Procedural Requirements for Agency Rulemaking, 87 Harv.L.Rev. 782, 790-801 (1974). Certainly where a balancing of various components of the public interest is a necessary condition for the grant of a particular application, something more than the minimal notice and comment procedures of § 553 may well be called for, see, e. g., Independent Bankers Ass'n v. Bd. of Governors of the Fed. Res. Sys., 170 U.S.App.D.C. 278, 290, 516 F.2d 1206, 1218 (1975), but this will seldom be true where the necessary balancing is undertaken in making a quasi-legislative policy of broad applicability.
 
 
 [20]
 See, e. g., Report and Statement of Programming Policy, 44 F.C.C. 2303, 2308-09, 2312-13, 2317 (1960); Public Service Responsibilities of Broadcast Licensees ("Blue Book") 55-56 (1947)
 
 
 [21]
 See note 19, supra. Since the Commission clearly was not engaged in a quasi-judicial function, where trial-type procedures would be appropriate and the substantial evidence test applied upon judicial review, some kind of hearing was not necessary even though various facts germane to the general policy determinations under consideration in fact have been the object of some disagreement. See Washington Utilities & Transp. Comm'n v. FCC, 513 F.2d 1142, 1165 & n. 31 (9th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975)
 
 
 [22]
 Chrysler Corp. v. DOT, 472 F.2d 659, 669 (6th Cir. 1972) (agency may "act on the basis of date contained in its own files or on its own views or opinions"); Consumers Union v. Consumer Product Safety Commission, 491 F.2d 810, 812 (2d Cir. 1974) (it may be "sufficient that the regulations (are) supported by evidence in the Commission's files, or even by its experience"); see Flying Tiger Line, Inc. v. Boyd, 244 F.Supp. 889, 892 (D.D.C.1965). With this doubtlessly in mind, the FCC took care to point out in its Notice of Inquiry and Proposed Rule Making that it might "also take into account other relevant data before it, in addition to the specific data invited by this Notice." 28 F.C.C.2d at 372-73; J.A. 121
 
 
 [23]
 Section 553(c) provides that "(a)fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c) (Supp. V 1975) (emphasis added)
 
 
 [24]
 As a practical matter, of course, a reviewing court generally will have a less substantial record to review in cases of informal rulemaking than it will when faced with administrative action undertaken upon a formal hearing held pursuant to §§ 556 and 557. Consequently, a reviewing court must perforce rely even more on an agency's statement of reasons, if it is not effectively to abdicate its proper role in the administrative process. On the other hand, the sufficiency of an agency's "statement" must also be gauged in light of the court's more limited scope of review in passing upon informal rulemaking. The reviewing court's legitimate function in such cases is limited for the most part to assuring that an agency, "given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future." Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (1968)
 
 
 [25]
 In Ruckelshaus this court held that both the legislative history and statutory scheme of the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 135 et seq. (1970), require the EPA Administrator to issue a notice of cancellation and thereby to commence administrative proceedings whenever he finds that a substantial question exists concerning the safety of a registered pesticide. 439 F.2d at 594. Since the Administrator had refused to initiate the required proceedings, though he had independently concluded that the use of DDT should be reduced as much as practicable during the continuation of further studies, we were fully justified in admonishing that
 (t)he statutory scheme contemplates that these questions (of balancing the risks of a pesticide against its benefits) will be explored in the full light of a public hearing and not behind the closed doors of the Secretary.
 Id.
 Likewise, in a case emphasized by petitioner, Moss v. CAB, 139 U.S.App.D.C. 150, 430 F.2d 891 (1970), we were faced with a demonstrably different situation from the one now confronting us. A number of congressmen petitioned this court to review the lawfulness of certain fare increases filed by the airlines with the Civil Aeronautics Board (CAB). The rate-making proceeding at issue involved ex parte meetings with airline representatives followed by what was alleged to be nothing more than a pro forma public hearing limited to oral argument. Id. at 152, 430 F.2d at 893. We found that the CAB's order, setting forth a rate-making formula for increased fares which the Board "propose(d) to accept", id. at 155, 430 F.2d at 896, resulted in Board-prescribed rather than carrier-proposed rates, since "the pressures on the carriers to file rates conforming exactly with the Board's formula were great, if not actually irresistible." Id. at 156, 430 F.2d at 897. As such, we held the Board's action invalid for failure to comply with the statutory notice and hearing requirements of Federal Aviation Act § 1002(d), 49 U.S.C. § 1482(d) (1964), and, by necessary implication, for ignoring the rate-making criteria specified in § 1002(e) of the Act, id. § 1482(e). Clearly, then, Moss presents a very different case from the one sub judice. The only statutory procedural requirements applicable to the FCC's informal rulemaking in this case are to be found in the APA and its own regulations, none of which petitioner has specifically identified as having been violated.
 
 
 [26]
 We note that section 4 of the Government in the Sunshine Act, Pub.L. No. 94-409, 90 Stat. 1241 (Sept. 13, 1976), amends § 557 of the APA, 5 U.S.C. § 557 (1970), so as expressly to prohibit ex parte communications of the kind engaged in by NAB officials here, but only whenever a hearing is required to be conducted in conformity with APA § 556, id. § 556. Such a hearing was not required in the informal rulemaking proceedings in Docket 19142, however. We express no view as to the possible applicability of section 3(a) of the same Act, amending title 5 of the Code to include new § 552b on open meetings, to these discussions between industry representatives and Chairman Wiley, except to note that these discussions would appear not to fall strictly within the Sunshine Act's definition of "meeting", see 5 U.S.C. § 552b(a)(2), and that, in any event, these new procedural requirements have only become effective after the contacts in question
 
 
 [27]
 Petitioner also asserts that the FCC abused its authority by exploiting its sensitive relationship with broadcast licensees to coerce them into a measure of self-regulation, just as it had in the "family viewing hour" programming policy area. Petitioner's Brief at 26-27. In Writers Guild of America, West, Inc. v. FCC, 423 F.Supp. 1064 (C.D.Cal.1976), a district court recently held that the adoption of the family viewing hour policy by the television networks and the NAB at the behest of the Commission violated the APA because the Commission ignored § 553's requirement that interested persons have an opportunity to participate in the policy-making process, whether they be members of the public or representatives of the regulated industry. 5 U.S.C. § 553 (Supp. V 1975)
 The record in this case reflects a total disregard of the procedural protections afforded by the APA. Without providing public notice and without affording any opportunity for interested parties to be heard, the Commission, acting through its Chairman, negotiated with powerful industry forces to form new policy for television, new policy which affects millions of lives. The Commission dictated and negotiated this new policy wholly outside the procedures of the Act.
 Id. at 1151.
 In the case sub judice, however, we have concluded that the FCC substantially complied with the procedural requirements of § 553, and we do not consider that the meetings between the FCC's Chairman and NAB representatives compel a contrary conclusion. If we were to accept the proposition implicit in petitioner's argument that the FCC may never resort to discussions with members of the industry in a general effort to have its regulatees conform to their public service obligations the Commission would have little choice but to abandon any reasonable expectation of salutary self-regulation and to affirmatively regulate throughout the areas of children's programming and advertising. The problem, of course, is necessarily a matter of degree, and an agency may well be found to have abused its authority were it to employ overbearing "jawboning" or "arm-twisting" tactics. In the Writers Guild decision, the Commission was held to have overstepped its authority when the Commission Chairman threatened "regulatory actions up to and including the relicensing process . . . ," if broadcasters did not reduce substantially the amount of violent and "adult" material shown during evening hours. Id. at 1149. At least in the case now before us, however, we are satisfied that the Commission did not coerce the industry into accepting agency-decreed policies or standards negotiated at closed-door meetings. Any coercion that may have been involved in this case would appear to result more from petitioner's commendable energies and interest in improving children's television by petitioning for these proceedings than from the Commission itself.
 
 
 [28]
 Where Congress wanted to prohibit ex parte contacts it clearly did so. Thus APA § 5(c) forbids ex parte contacts when an "adjudication" is underway, but even that prohibition does not apply to "the agency or a member or members of the body comprising the agency." 5 U.S.C. § 554(d)(C) (1970). On the other hand, we have APA § 6(a), a rather cryptic provision, which states in relevant part:
 So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy, or otherwise, or in connection with an agency function.
 Id. § 555(b) (emphasis added). Section 555 sets forth "(a)ncillary matters" which by subsection 555(a) apply to sections 551 through 559, including of course informal rulemaking under section 553. Most of the subsections in section 555, including subsection 555(b), deal with ancillary matters that would normally arise only in the context of adjudications. However, like subsection 555(e) which by its terms applies to "any agency proceeding," subsection 555(b) applies to any "agency function," which certainly includes rulemaking. The above-quoted language can reasonably be read as sanctioning ex parte contacts, subject of course to an agency's determination that they are consistent with "the orderly conduct of public business." Thus, this particular subsection gives added support to the Commission's contention that "(t)he fact that the public was not part of meetings Chairman Wiley held with industry representatives no more means the public was excluded from participation in this proceeding than does the fact that the public was not part of meetings former Chairman Burch had held with representatives of ACT." Government's Brief at 58.
 If Congress wanted to forbid or limit ex parte contacts in every case of informal rulemaking, it certainly had a perfect opportunity of doing so when it enacted the Government in the Sunshine Act, Pub.L. No. 94-409, 90 Stat. 1241 (Sept. 13, 1976). Referring to Executive Order 11920 and the general policy declaration of the Sunshine Act's section 2, which states that it is "the policy of the United States that the public is entitled to the fullest practicable information regarding the decisionmaking processes of the Federal Government," the court in Home Box Office goes on to conclude that "(c) ertainly any ambiguity in how Sangamon should be interpreted has been removed by (these) recent congressional and presidential actions." Home Box Office, supra, 185 U.S.App.D.C. at ---, 567 F.2d at 56. In our view, any support that these actions might lend to that decision's extension of Sangamon to all informal rulemaking proceedings is rendered nugatory by what Congress chose not to do. That it did not extend the ex parte contact provisions of amended section 557 to section 553 even though such an extension was urged upon it during the hearings is a sound indication that Congress still does not favor a per se prohibition or even a "logging" requirement in all such proceedings.
 
 
 [29]
 Having been distinguished in a footnote, see Home Box Office, supra, 185 U.S.App.D.C. at --- n. 124, 567 F.2d at 56, 98 U.S.App.D.C. 432, Courtaulds was effectively overruled two pages later. See id. at ---, 567 F.2d at 57. The Home Box Office opinion also states that footnote 16 of Courtaulds, quoted supra, is plainly in error to the extent it suggests that Sangamon did not involve rulemaking. Id. at --- n. 124, 567 F.2d at 57. We do not think that this is what this court meant to imply in Courtaulds ; rather we believe that that opinion was simply recognizing that there are different kinds of informal rulemaking of which TV channel allocations are one very special sort because of their "adjudicatory" overtones
 
 
 [30]
 As further support "favoring extension of the ex parte prohibition of the Sunshine Act to informal rulemaking," the Home Box Office opinion offers two items: Senate Subcommittee hearings on S.1289, Open Communications Act of 1975, and a study offered by the Association of the Bar of the City of New York. See Home Box Office, supra, 185 U.S.App.D.C. at --- n. 128, 567 F.2d at 57. These warrant little comment in light of Congress' failure to heed them, but it is at least instructive to point out that Mr. Henry Geller, amicus in Home Box Office and counsel to petitioner in the case sub judice, wrote in a prepared statement entered during the hearings on S.1289:
 Also, Sangamon, I believe, should be applicable only where there are conflicting claims by private industry entities to a valuable privilege, and not to rule making procedures where conflict stems from the participation of listener or other public groups.
 Hearings before the Subcomm. on Admin. Prac. & Proc., 94th Cong., 1st Sess. 103 n. 12 (1976). We agree, and believe that the case now before us falls squarely within that exception.
 
 
 [31]
 Finally, the court in Home Box Office further held that Commission reception of ex parte communications violated the agency's own rules published at 47 C.F.R. § 1.415 (1975). The panel there admits that this "inference" is "less easy to draw," in part because of "the apparent long-standing Commission interpretation of its own rules to allow ex parte contacts . . . ." Home Box Office, supra at --- n. 122, 567 F.2d at 55. We cannot agree that ex parte contacts in the instant case violated Rule 1.415 for the proffered justification for such a conclusion is irreconcilable with the fact that the Commission since 1965 has had rules that forbid ex parte contacts by interested persons in "restricted" adjudicatory and rulemaking proceedings. See 47 C.F.R. §§ 1.1201 et seq. (1976). If the Commission intended to prohibit ex parte contacts in a case such as this, we should presume that it simply would have done so explicitly under Rules 1.1201 et seq
 
 
 [32]
 The Commission has been delegated authority to promulgate rules and regulations "from time to time, as public convenience, interest, or necessity requires . . . ." 47 U.S.C. § 303(r) (1970). It may also use its licensing function to promote the public interest. See id. §§ 307(a), 309(a) (initial grants); id. § 307(d) (renewals); Pinellas Broadcasting Co. v. FCC, 97 U.S.App.D.C. 236, 230 F.2d 204, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956) (award to a competing applicant on basis of superior programming); Henry v. FCC, 112 U.S.App.D.C. 257, 302 F.2d 191, cert. denied, 371 U.S. 821, 83 S.Ct. 37, 9 L.Ed.2d 60 (1962) (sole applicant rejected for inadequacy of proposed programming); cf. 47 U.S.C. § 303(m) (1970) (suspension); id. § 312(a) (Supp. V 1975) (revocation)
 
 
 [33]
 The "substantial evidence" test of § 706(2)(E) of the APA, 5 U.S.C. § 706(2)(E) (1970), generally applies only to straight-forward adjudications or formal rulemaking "on the record" held pursuant to §§ 556 and 557. See Automotive Parts & Accessories Ass'n, supra, 407 F.2d at 338
 
 
 [34]
 Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)
 
 
 [35]
 Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)
 
 
 [36]
 The public interest standard which governs Commission regulation of the broadcast medium has been precisely defined in only a few regulatory areas. E. g., 47 U.S.C. § 315 (Supp. V 1975) ("equal time" provision); 47 C.F.R. § 73.651 (1976) (minimum operating times); id. § 73.636(a)(1) (multiple ownership rules). For the most part, it is not susceptible of specific definition because of its vague, subjective nature. This was not unintended. The Supreme Court explained in National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), that the standard could not be inflexible if the FCC were, as Congress obviously intended, to adapt its regulatory actions to changed circumstances:
 While Congress did not give the Commission unfettered discretion to regulate all phases of the radio industry, it did not frustrate the purposes for which the Communications Act of 1934 was brought into being by attempting an itemized catalogue of the specific manifestations of the general problems for the solution of which it was establishing a regulatory agency. That would have stereotyped the powers of the Commission to specific details in regulating a field of enterprise the dominant characteristic of which was the rapid pace of its unfolding.
 Id. at 219, 63 S.Ct. at 1011.
 
 
 [37]
 See, e. g., Silva v. Romney, 473 F.2d 287, 292 (1st Cir. 1973); Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 88, 439 F.2d 584, 598 (1971); Pressley v. FCC, 141 U.S.App.D.C. 283, 288-89, 437 F.2d 716, 721-22 (1970); Environmental Defense Fund, Inc. v. HEW, 138 U.S.App.D.C. 381, 428 F.2d 1083 (1970); Cherry v. Mathews, 419 F.Supp. 922, 924 (D.D.C.1976) (secretary of HEW required to promulgate regulations effectuating § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp. V 1975). But see SEC v. Chenery Corp., 332 U.S. 194, 202-03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), where the Supreme Court stated:
 The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied to the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise.
 There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.
 
 
 [38]
 Of course, if it were, this might be a different case. See Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 183, 454 F.2d 1018, 1026 (1971); Greater Boston Television Corp., supra, 444 F.2d at 852. See also text accompanying note 20, supra
 
 
 [39]
 The Commission noted in the Report that its first recognition of children's programming as a distinct category came in its Programming Policy Statement, 44 F.C.C.2d 2303, 2314 (1960), which listed "Programs for Children" as one of fourteen "major elements usually necessary to meet the public interest, needs and desires of the community." Id. Children's programs were not singled out for special emphasis, and, as usual, ultimate decisions on specific programming content were left to the discretion of the licensee. See 50 F.C.C.2d at 4; J.A. 6
 
 
 [40]
 ACT argues forcefully that the Commission erred in not adopting a rule to prohibit product commercials from programs specifically directed to pre-school aged children, inasmuch as the Commission itself found that such commercials are per se deceptive. Petitioner's Brief at 28-32; Petitioner's Reply Brief at 8-12. Contrary to what ACT maintains, the Commission in fact did not specifically find that pre-school aged children could not distinguish between programming content and commercial message under any circumstances. Its Report did note that there was "evidence that very young children cannot distinguish conceptually between programming and advertising . . .," 50 F.C.C.2d at 11, J.A. 15, and that "on the basis of the information gathered in the course of (its) inquiry, it has become apparent that children, especially young children, have considerable difficulty distinguishing commercial matter from program matter." Id. at 15; J.A. 21. The Commission nevertheless "recognize(d) that, as many broadcasters noted, these findings are not conclusive. . . ." Id
 We cannot now say that the positive actions taken by the FCC to alleviate these apparent difficulties by mandating a clear separation of programming from advertising and avoidance of "host-selling", for example were insufficient as a matter of law. Nonetheless, the Commission has warned that "special safeguards may be required to insure that the advertising privilege is not abused . . .," id. at 11, J.A. 15, and, having recognized that a serious problem exists in this area, the agency has a continuing responsibility to do something further about it should subsequent experience demonstrate that more needs to be done.
 
 
 [41]
 FCC, Public Service Responsibilities of Broadcast Licensees (1947)
 
 
 [42]
 FCC, Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949)
 
 
 [43]
 See notes 10, 13, supra
 
 
 [44]
 The only sanction available against an NAB member found to have violated a Code provision is revocation of membership. Petitioner maintains that the NAB rarely resorts to this sanction "since that also means that the Association loses the station's membership dues . . .." Petitioner's Brief at 41. The INTV, on the other hand, apparently has no sanctions available to it beyond the power of recommending compliance